UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
LONDON


JOURNEY ACQUISITION-II, L.P.,    )
                                  )
      Plaintiff,                )       Civ. No: 12-108-GFVT
                                  )
V.                                )
                                  )    **MEMORANDUM OPINION**
EQT PRODUCTION COMPANY,       )            **&**
                                    )          **ORDER**
      Defendants.          )


\*\*\*   \*\*\*   \*\*\*   \*\*\*

     This case concerns the interpretation of a number of contractual agreements entered into by Journey Acquisition-II, LP (Journey) and EQT Production Company (EQT). The agreements involve conveyances of interests in oil, natural gas, mineral rights, and related assets connected to several large tracts of land in southeastern Kentucky. They also involve drilling rights and the ownership or lease of the acreage on which certain oil wells are located. In 2001, EQT agreed to sell, lease, and otherwise transfer certain of these lands and rights to Journey. The primary dispute presently before the Court concerns which lands and rights were actually conveyed. The parties have filed several motions and cross-motions for summary judgment and for partial summary judgment, all of which have been fully briefed. At Journey's request, the Court held oral arguments on the motions for partial summary judgment on July 7, 2014, during which the Court denied a related motion to strike [R. 102] but took the other motions under advisement. For the reasons that follow, the Court denies EQT's motion for summary judgment; grants in part and denies in part Journey Acquisition's

first motion for partial summary judgment; and grants Journey Acquisition's second, third, and fourth motions for partial summary judgment.

**I**

**A**

Journey Acquisition is a Texas limited partnership involved in oil and gas exploration and production in Kentucky. [R. 67 at 2.] EQT is a Pennsylvania corporation that is also extensively involved in the production and development of oil and gas. [*Id*.] The real property that is the subject of their dispute is located mainly in Letcher, Perry, and Leslie Counties, and covers thousands of noncontiguous acres. The parties also dispute various wells, equipment, and mineral rights associated with those properties.

Essentially, there are three types of property interests at issue. First, EQT owned in fee simple about 100 tracts of land across eastern Kentucky (Fee Properties), and had the authority to either drill on those lands itself or lease the drilling rights to another party. [R. 86-1 at 2; R. 87-1 at 3.] Second, EQT leased several hundred oil and gas interests located primarily on properties in Eastern Kentucky, meaning that EQT had the right to explore for and produce oil and gas beneath lands actually owned by third parties (Third-Party Leases). [R. 86-1 at 2; R. 87-1 at 2.] For these properties, EQT could, and did, assign its rights as a lessee to another party. Third, EQT also owned several hundred existing wells along with the associated equipment, pipeline operations, and various other agreements that typically accompany oil and gas production. [R. 67 at 3-4; R. 87-1 at 3.] For most of the properties at issue, EQT was either the fee owner or lessee, but for some of the properties, EQT operated with Kentucky River Coal Company (KRCC) as joint venturers. [R. 86-1 at 3.]

In 2001, EQT decided to "divest" itself of a large number of its oil-producing properties in order to focus on gas production. [R. 86-1 at 3.] To assist in this transfer, EQT hired an adviser, Randall & Dewey, Inc., who then prepared a "2001 Kentucky Property Divestment Data Room Summary" (2001 KPD DRS) describing the interests and properties that EQT planned to sell or otherwise transfer. [*Id*. at 3-4.] EQT also prepared a number of maps to illustrate the boundaries of the properties it was offering. These were included in the 2001 KPD DRS. [*Id*.] The 2001 KPD DRS was shown to potential purchasers who, if interested, could see more detailed information after signing a confidentiality agreement and then bid on the property. [*Id*. at 7.] Journey's president, Brian Baer, and a petroleum engineer who worked for Journey at the time named Greg Shockley (who now works for EQT), evaluated EQT's offering, along with other consultants retained by Journey. [*Id*. at 7-8.] Journey then submitted a bid and ultimately became the successful purchaser. [*Id*. at 8.]

On October 4, 2001, Journey and EQT entered into a Purchase and Sale Agreement (PSA) that was made effective as of July 1, 2001. The purchase price was $64,090,000. [R. 67 at 3; R. 87-2 at 2.] In the PSA, EQT agreed to sell Journey its title to and interests in numerous properties, wells, pipelines, and other assets located in five Kentucky counties. [R. 87-1 at 8; R. 87-2 at 7.] The PSA also contained an agreement to apply Kentucky law to any dispute [R. 87-2 at 41], and included a merger clause stating that this PSA superseded all prior agreements, understandings, and discussions. [*Id*. at 40.] Part of the interests described in the PSA included EQT's leasehold rights under the Third-Party Leases and a variety of mineral rights to the Fee Properties Journey purchased. [*Id*. at 7.] The PSA further provided for a due diligence period of nearly two months and possible price adjustments if necessary. [*Id*. at 19-25.] Attached to the PSA were also several exhibits listing or describing in more

detail the property that EQT was transferring. For instance, Exhibit A to the PSA lists and describes the various leasehold tracts that Journey acquired from EQT. [*See* R. 87-2 at 56-72.] Exhibit D to the PSA lists the wells that were being conveyed. [R. 87-4 at 17-29.] Exhibit J to the PSA lists and describes the various fee properties involved in the transfer. [*See* R. 87-6 at 34-37.] The PSA also contained a "Further Assurances" clause stating that Journey was to receive any oil and gas interest owned by EQT within certain blue-outlined boundaries on a series of maps attached as Exhibit N. [R. 87-2 at 39.] The parties now dispute the exact meaning of this clause and whether EQT conveyed any property to Journey that was not within the blue boundaries of the Exhibit N maps.

At closing on November 30, 2001, the parties completed the second phase of their deal, in which they executed two other documents called "the Master Assignment," and a lease of EQT's fee properties, called "the Oil and Gas Lease" (or "2001 Lease"). [R. 86-1 at 10-11.] In the Master Assignment, EQT formally assigned to Journey a list of properties that EQT leased from third parties, as well as several hundred wells with their associated rights and equipment. [R. 87-12.] The descriptions of the lease properties were attached to the Master Assignment as Exhibit A, and the list of wells being transferred was attached as Exhibit B. [*Id*. at 5, 23.] For these properties, EQT assigned Journey the rights, title, and interests "down to the stratigraphic equivalent of the base of the Devonian Shale formation." [*Id*. at 1.] In the 2001 Lease, EQT leased to Journey a number of properties that EQT owned in fee, leasing them for a primary term of five years. [R. 87-8 at 1-2.] Attached to the 2001 Lease as Exhibit A was a tract-by-tract description of these leased properties. [R. 87-8 at 14-17.] Also attached was Exhibit A-1 containing a set of maps that listed and described the tracts subject to the lease and were "virtually identical" to the maps in Exhibit N to the PSA.

[*Id*. at 18-29.] Some of the assignments and leases were only partially assigned or leased to Journey, and where that was the case, an explanatory endnote was placed in the property description on the appropriate exhibit. The largest third-party lease involved in the transaction was the Fordson Lease, which contained over 6,333 noncontiguous acres in Perry, Leslie, and Letcher Counties. [R. 86-1 at 12.]

During the due diligence period between October 4 and November 30 of 2001, EQT's land-administration director Cindy Perdue oversaw the task of "scrubbing" the exhibits for accuracy "trying to get them right before closing." [R. 87-1 at 19; R. 81 at 34-37, 65-66.] Journey retained a company called Title Pro and its president Jay Karickhoff to confirm EQT's title to the land on which the top-producing wells were located, but because that well value was the basis for confirming the value to Journey's secured lender, Karickhoff was not concerned with evaluating the title to any part of land not associated with the existing high-producing well sites. [R. 87-1 at 19; R. 73 at 5, 12-13, 37-38.] Neither Mr. Karickhoff nor Ms. Perdue could recall assuming or being told that the land being conveyed was limited solely by the blue outlines on the attached maps. [*See* R. 73 at 33-41; R. 81 at 72-73.] EQT now claims to own many of the properties that Journey claims were conveyed in the 2001 transaction. In particular, EQT claims that the Exhibit N maps limit the conveyances to only the property located within the blue boundaries, while Journey claims that it received whatever the actual language in the documents described.

**B**

Journey filed suit in this Court on June 13, 2012, and EQT filed a counterclaim the next month. During the course of discovery, Journey amended its complaint in June 2013, in July 2013, and yet again in January 2014. The instant motions relate to the claims asserted in

the Third Amended Complaint [R. 67], which include the following: 1) claims for declaratory judgment confirming the 2001 Agreement and quieting title in Journey as owner of EQT's leasehold interest in the disputed Third-Party Lease properties and their associated rights and interests, and also as the owner of the disputed fee properties with their associated rights and interests; 2) claims for trespass and an accounting of all income attributable to the disputed wells, or, in the alternative, that EQT trespassed willfully and in bad faith and must pay Journey the sale price received by EQT for the wells claimed by Journey; 3) alternative claims for conversion or unjust enrichment concerning disputed wells, and for any resulting damages; 4) breach of contract claims, arguing that EQT has breached the 2001 Agreement; and 5) claims for attorney's fees and interest as well as both pre- and post-judgment interest.

In EQT's Answer to the Third Amended Complaint, EQT responded with several counterclaims, including 1) a request for declaratory judgment to quiet title in EQT concerning all the disputed property; 2) a request for reformation of the 2001 Agreement to the extent that it could be construed to convey any part of any property outside of the blue boundaries on the Exhibit N maps; and 3) claims for conversion or trespass against Journey concerning the disputed wells.  [R. 68 at 5-10.]

Presently before the Court are the parties' motions for summary judgment and for partial summary judgment.  EQT requests that the Court enter judgment in EQT's favor on all of the claims in Journey's Third Amended Complaint, and to also enter judgment in EQT's favor on EQT's counterclaims for declaratory judgment.  [R. 86 at 1.]  On the same day that EQT filed its summary judgment motion, Journey also filed four partial motions for summary judgment.  [R. 87, 88, 89, 90.]  In its first motion, Journey moves the Court to find in its favor on the breach of contract claims, and in particular to find that EQT breached the

Further Assurances clause of the PSA by failing to convey all of its rights, title and interest in and to the Further Assurances wells and leases that were located within the blue boundaries, or to quiet title to those interests in Journey and pay Journey the net-revenue amounts received plus interest.  [R. 87 at 3.]  Journey's second motion requests partial summary judgment in its favor concerning its request for declaratory judgment confirming that the 2001 transaction conveyed to Journey the Third-Party Leases and Fee Properties as identified in Exhibits A and J to the PSA, including any portions outside the blue boundaries on the Exhibit N maps.  [R. 88 at 1-2.]  Construing the PSA in this manner would necessarily result in denying EQT's counterclaim requesting the Court to construe the agreement to mean only the lands within the blue boundaries were transferred.  Journey's third motion requests summary judgment in its favor concerning EQT's affirmative defense of mutual mistake, and on EQT's related counterclaim for reformation of the contractual documents.  [R. 89 at 1-2.]  Finally, Journey moves for summary judgment in its favor on EQT's counterclaim for declaratory judgment concerning Journey's drilling obligations under the 2001 Lease.  [R. 90 at 1.]  Specifically, EQT's counterclaim alleges that the 2001 Lease required Journey to drill a producing well on certain leased tracts of land within five years in order to retain the lease for those tracts at the conclusion of the primary term.  [R. 68 at 8.]  Journey denies that drilling was required and seeks a declaration to that effect.  [R. 90 at 2.]

## II

### A

Because the parties are diverse and the amount in controversy is well over $75,000, this action is in federal court on the basis of diversity jurisdiction, 28 U.S.C. § 1332.  [R. 38.]  Because Kentucky is the forum state, its substantive law will be used.  *Rawe v. Liberty Mut.*

*Fire Ins. Co.*, 462 F.3d 521, 526 (6th Cir. 2006) (citations omitted).  However, federal procedural law will govern as applicable, including in establishing the appropriate summary judgment standard.  *Weaver v. Caldwell Tanks, Inc.*, 190 F. App'x 404, 408 (6th Cir. 2006).

Summary judgment is appropriate when "the pleadings, discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2); *Celotex Corp. v. Catrett,* 477 U.S. 317, 323-25 (1986).  "A genuine dispute exists on a material fact, and thus summary judgment is improper, if the evidence shows 'that a reasonable jury could return a verdict for the nonmoving party.'"  *Olinger v. Corp. of the President of the Church*, 521 F. Supp. 2d 577, 582 (E.D. Ky. 2007) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)).  Stated otherwise, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff."  *Anderson*, 477 U.S. at 252.

The moving party has the initial burden of demonstrating the basis for its motion and identifying those parts of the record that establish the absence of a genuine issue of material fact.  *Chao v. Hall Holding Co., Inc.*, 285 F.3d 415, 424 (6th Cir. 2002).  The movant may satisfy its burden by showing "that there is an absence of evidence to support the non-moving party's case."  *Celotex Corp.*, 477 U.S. at 325.  Once the movant has satisfied this burden, the non-moving party must go beyond the pleadings and come forward with specific facts to demonstrate that a genuine issue exists.  *Hall Holding*, 285 F.3d at 424 (citing *Celotex Corp.*, 477 U.S. at 324).  In applying the summary judgment standard, the Court must review the facts and draw all reasonable inferences in favor of the non-moving party.  *Logan v. Denny's,*

*Inc.*, 259 F.3d 558, 566 (6th Cir. 2001) (citing *Anderson*, 477 U.S. at 255).

**B**

"It is well settled that the interpretation of contracts is an issue of law for the court to decide." *Equitania Ins. Co. v. Slone & Garrett, P.S.C.,* 191 S.W.3d 552, 556 (Ky. 2006). To establish a claim for breach of contract, Kentucky common law requires the plaintiff to establish: "1) existence of a contract; 2) breach of that contract; and 3) damages flowing from the breach of contract." *Fifth Third Bank v. Lincoln Fin. Sec. Corp*., 453 F. Appx. 589, 601 (6th Cir. 2011) (quoting *Metro Louisville/Jefferson Cnty. Gov't v. Abma,* 326 S.W.3d 1, 8 (Ky. Ct. App. 2009). "An elemental principle" of contract interpretation is that a contract must be construed "in accordance with the intention of the parties. The court must seek to ascertain how the parties intended their agreement to operate at the time they entered into it." *L.K. Comstock & Co., Inc. v. Becon Const. Co*., 932 F. Supp. 948, 964 (E.D. Ky. 1994) *aff'd sub nom. L.K. Comstock & Co., Inc. v. Becon Const. Co., Inc*., 73 F.3d 362 (6th Cir. 1995).

Another rule of contract construction is that ". . . specific terms and exact terms are given greater weight than general language; . . . [and] separately negotiated or added terms are given greater weight than standardized terms or other terms not separately negotiated." *Id*. at 967 (quoting Restatement (Second) of Contracts 203(c), (d) (1979)). In doing so, the Court must read the various provisions of the contract as a whole, and should look to interpretations that "promote harmony" between any apparently conflicting provisions. *Id.* at 964 (citing *Cook United, Inc. v. Waits*, 512 S.W.2d 493, 495 (Ky. 1974)). Similarly, an interpretation of the contract that "gives a reasonable, lawful, and effective meaning to all the terms is preferred to an interpretation which leaves a part unreasonable, unlawful, or of no

effect." *Id*. at 967 (quoting Restatement (Second) of Contracts 203(a) 1979)) (internal quotation marks omitted).

Where the parties execute a written instrument, an unambiguous written contract "will be enforced strictly according to its terms," and the court will interpret those terms "by assigning language its ordinary meaning and without resort to extrinsic evidence." *Frear v. P.T.A. Indus., Inc*., 103 S.W. 3d 99, 105-06 (Ky. 2003) (internal quotations omitted). If there is no ambiguity, the court's analysis extends only to the four corners of the contract to determine the parties' intention. *Hoheimer v. Hoheimer*, 30 S.W.3d 176, 178 (Ky. 2000). If, however, the contract is "facially reasonably susceptible to more than one interpretation," the Court will give "great weight" to the parties' actions, subsequent conduct, or other declarations indicating their mutual intent and understanding. *L.K. Comstock & Co., Inc.*, 932 F. Supp. at 965 (quoting *A.L. Pickens Co. v. Youngstown Sheet & Tube Co*., 650 F.2d 118, 120 (6th Cir. 1981)).

## C

As a threshold matter, the Court must first address a jurisdictional issue raised by EQT. EQT contends that Journey's claims are barred by various statutes of limitation and by equitable doctrines. First, EQT asserts that Section 17 of the PSA sets a contractual limitation of one year in which to bring claims concerning the agreement. [R. 86-1 at 40.] Because the PSA states that the "Seller's representations and warranties shall survive the closing for a period of one (1) year only," and because Journey brought suit nearly eleven years after closing, EQT argues that all of Journey's claims are barred. [*Id*.] However, the PSA specifically lists the "Representations of Seller" in a separate section from the rest of the contract [R. 87-2 at 3-6 (Section 4(a))], and further states in bold, capital letters that the list

of representations in Section 4(a) is "EXCLUSIVE." [*Id*. at 6-7.] The language and structure of the contract appear to indicate that only those listed, express warranties in Section 4(a) are limited to the one-year survival period. Because Journey's claims in the present suit are not related to those express warranties, and EQT does not point to any express warranties implicated by Journey's claims, the one-year limitation in Section 17 is not applicable. Moreover, Section 17 does not refer to actual claims, causes of action, or lawsuits, but rather utilizes "survival" language specifically related to how long the seller's representations will survive in the context of closing. Although Kentucky courts have held that parties may contract for a shorter limitations period for bringing a lawsuit, such contractual reductions typically apply where the contract specifically addresses lawsuits or legal causes of action, which the PSA in this case does not. *See, e.g, Munday v. Mayfair Diagnostic Laboratory*, 831 S.W.2d 912, 914 (Ky. 1992) (finding that parties "are at liberty to contract for a limitation period less than the period fixed by statute); *Prewitt v. Supreme Council of Royal Arcanum*, 194 S.W.2d 633, 634-35 (Ky. 1946) (addressing cases in which the parties specifically contracted to shorten the period of time in which they could bring suit for breach of their contract). Thus, given the language used in Section 17 of the PSA, EQT's argument that it should bar this suit fails.

Second, EQT asserts that various statutes of limitations in Kentucky tort law bar Journey's claims for trespass, unjust enrichment, conversion, and declaratory judgments. [R. 86-1 at 40.] Concerning Counts 1 and 2 for declaratory judgments, EQT appears to incorrectly associate those counts with the trespass and conversion claims, when in actuality those claims relate to the interpretation of the contract and Journey's title claims, both of which are governed by fifteen-year statutes of limitations. K.R.S. § 413.090; K.R.S.

§ 413.010. While EQT correctly notes that the conversion claim is governed by a two-year limitations period, Journey asserted its claim of conversion only as an alternative theory of relief to its trespass claim. [R. 67 at 23-24.] As Journey concedes, if the Court were to find that Journey is limited to recovery only under the alternative conversion claim, then Journey's claim for conversion would be barred by the two-year statute of limitations. [R. 101 at 37 n.128.] EQT is also correct that Kentucky's five-year limitations period likely bars Journey's unjust enrichment claim, but since Journey has pled that count as an alternative theory of recovery it will not act as a bar to Journey's claims concerning breach of contract. As for the trespass claim, Journey argues that EQT committed a *continuing* trespass, for which the injured party may recover damages during the five-year period preceding the filing of the lawsuit. [*Id.* at 37 (citing *Fergerson v. Utilities Elkhorn Coal Co.*, 313 S.W.2d 395, 399 (Ky. 1958)).] Moreover, the parties have stipulated to Journey's damages model [R. 87-14; R. 125], under which Journey seeks only the amounts associated with the disputed wells during the five-year period preceding the parties' tolling agreement. Accordingly, none of these statutes of limitations act as a *complete* bar to Journey's recovery, and to the extent that EQT relies on them as a basis for summary judgment in its favor, EQT's motion will be denied.

Finally, EQT argues that Journey's claims are also barred by the doctrines of laches, waiver, and estoppel. The doctrine of laches bars claims where the delay in asserting the claim "has worked such prejudice or disadvantage to parties adversely interested or such changed conditions have occurred in the meantime that enforcement of the claim is rendered inequitable." *Fightmaster v. Leffler*, 556 S.W.2d 180, 183 (Ky. Ct. App. 1977); *see also Plaza Condominium Ass'n, Inc. v. Wellington Corp.*, 920 S.W.2d 51, 54 (Ky. 1996)

(explaining that laches bars claims "where a party engages in unreasonable delay to the prejudice of others rendering it inequitable to allow that party to reverse a previous course of action"). Waiver is "a voluntary and intentional surrender or relinquishment of a known right, or an election to forego an advantage which the party at his option might have demanded or insisted upon." *Barker v. Stearns Coal & Lumber Co.*, 163 S.W.2d 466, 470 (Ky. 1942). Estoppel involves intentional conduct that causes the other party to detrimentally rely on the party's false or inconsistent representations or concealment of material facts. *See Edmondson v. Pennsylvania Nat'l Mut. Casualty Ins. Co.*, 781 S.W.2d 753, 755-56 (Ky. 1989).

Here, EQT asserts that Journey was told in 2006 that EQT intended to drill wells on property located outside the Exhibit N boundaries (specifically the Fordson lease), and that Journey did not complain about the drilling, but that now, years later, Journey has sued EQT for trespass concerning the drilling to which Journey had previously consented. [R. 86-1 at 42-43.] Journey counters that EQT has mischaracterized the meeting between Mr. Smallwood and Mr. Shockley in 2006, and that Journey did not authorize EQT to drill new wells nor did EQT request Journey's consent. Resolving the question of whether Journey knew or should have known that EQT intended to drill on property to which Journey now claims ownership depends on fact and credibility determinations and the weighing of deposition testimony concerning conversations that took place over eight years ago, and the interpretation of the parties' subsequent actions. The parties' arguments on this issue have bearing on EQT's claim that if it did commit trespass, it was only an innocent trespasser, and also on the question of whether Journey should be estopped from asserting its rights years after it may have acquiesced to EQT's actions. *See Fightmaster*, 556 S.W.2d at 183 ("[t]he

familiar maxim 'Equity aids the vigilant, not those who slumber on their rights,' furnishes an important rule to prevent the enforcement of stale demands. . . ").  Thus, EQT's laches, waiver, and estoppel claims all address issues of reasonableness, intent, reliance, and even misrepresentation or concealment, each of which in this case involve factual disputes that are more appropriately determined by a jury.[1]

## D

Journey's first and second motions for partial summary judgment overlap somewhat with EQT's motion for summary judgment, and therefore the Court will consider several of the main issues in those motions together.  A primary point of contention is whether the language in the documents at issue unambiguously conveyed certain interests to Journey, or whether the language is ambiguous such that extrinsic evidence may be examined to determine the parties' intent concerning the extent of the conveyances.  In EQT's motion for summary judgment, EQT at first contends that the contract is *not* ambiguous concerning the meaning of the map boundaries in Exhibit N, and argues that the PSA unambiguously conveys only the land, wells, and interests *within* the blue boundaries on the Exhibit N maps. [R. 86-1 at 23-30.]  EQT then argues in the same motion that if the Court finds an ambiguity does in fact exist, extrinsic evidence supports EQT's interpretation of the conveyances at issue.  During oral argument, EQT admitted that its stronger argument is for the existence of ambiguity [R. 129 (Transcript) at 69-70], and because the question of ambiguity pertains to all of the motions addressed herein, the Court will focus on EQT's contention that ambiguity exists concerning the conveyances.  [R. 86-1 at 30-39.]

---

[1] These issues also relate to EQT's claim that if it committed trespass it was at least an innocent trespasser. During the hearing held on July 7, 2014, Journey effectively conceded that even if the Court granted all its partial motions for summary judgment, Journey anticipated that the trespass claims would likely need to be decided by a jury.  [R. 129 (Transcript) at 85.]

In the absence of ambiguity, the terms in a written contract cannot be varied by parol evidence, which "consists of evidence of agreements between or the behavior of the parties prior to or contemporaneous with the contract," including "'evidence of a contemporaneous oral agreement on the same subject matter, verifying, modifying, contradicting, or enlarging a contract.'" *Luttrell v. Cooper Indus.*, 60 F.Supp. 2d 629, 631 (E.D. Ky. 1998) (quoting *M.R. Kopmeyer Co. v. Barnes*, 276 S.W. 2d 21, 23-24 (Ky. 1955)).  The unambiguous, written agreement "is presumed to be final and complete, with all prior negotiations abandoned or incorporated into the final document." *Grass v. Akins*, 368 S.W. 3d 150, 153 (Ky. Ct. App. 2012) (citations omitted).  Consequently, "when parties reduce their agreement to a clear, unambiguous, and duly executed writing, all prior negotiations, understandings, and agreements merge into the [written] instrument," which "cannot be modified or changed by prior parol evidence, except in certain circumstances such as fraud or mistake." *New Life Cleaners v. Tuttle,* 292 S.W.3d 318, 322 (Ky. Ct. App. 2009).  Moreover, "[t]he merger doctrine holds that all prior statements and agreements, both written and oral, are merged into the deed and the parties are bound by that instrument." *Yeager v. McLellan*, 177 S.W.3d 807, 809-10 (Ky. 2005) (quoting *Borden v. Litchford,* 619 S.W.2d 715, 717 (Ky. Ct. App. 1981)).

When an ambiguity exists, however, "a court may consider parol and extrinsic evidence involving the circumstances surrounding execution of the contract, the subject matter of the contract, the objects to be accomplished, and the conduct of the parties." *Cantrell Supply, Inc. v. Liberty Mutual Ins. Co*., 94 S.W. 3d 381, 385 (Ky. Ct. App. 2002).  A contract is ambiguous if it is "capable of more than one different, reasonable interpretations." *Ctl. Bank & Trust Co. v. Kincaid*, 617 S.W.2d 32, 33 (Ky. 1981); *see also Hazard Coal*

*Corp. v. Knight*, 325 S.W.3d 290, 298 (Ky. 2010) (explaining that ambiguity in a contract exists only if "a reasonable person would find it susceptible to different or inconsistent interpretations") (quoting *Cantrell Supply*, 94 S.W.3d at 385). Ambiguity may be patent or latent. A patent ambiguity exists where the contract language is uncertain on its face, *Roberts v. Roberts' Ex'r*, 186 S.W.2d 801, 803 (Ky. 1945), but the contract language may be "clear in its face and yet contain a latent ambiguity." *State Farm Mut. Auto. Ins. Co. v. Slusher*, 325 S.W.3d 318, 322 (Ky. 2010). "A latent ambiguity is one which does not appear upon the face of the words used, and it is not known to exist until the words are brought in contact with the collateral facts." *Id.* (quoting *Carroll v. Cave Hill Cemetery Co.*, 189 S.W. 186, 190 (Ky. 1916) (internal quotation marks omitted)). Determining whether a contract is ambiguous is a question of law for the court to decide. *First Com. Bank of Prestonsburg v. West*, 55 S.W.3d 829, 835 (Ky. Ct. App. 2000). If the court determines that ambiguity exists, the ambiguous language should generally be construed against the drafter. *See United States v. Seckinger*, 397 U.S. 203, 210 (1970); *Edwards v. Carlisle*, 179 S.W.3d 257, 261 (Ky. Ct. App. 2004) (acknowledging principle that "ambiguities should be resolved against the drafter" of a contract, albeit in the context of insurance benefits); *Cheshire v. Wright*, 237 S.W.2d 52, 54 (Ky. 1951).

Despite the extensive briefing, numerous arguments, and voluminous documents submitted in this case, the essential question is what property and interests were actually conveyed by the parties' agreement in 2001 and what was not conveyed. EQT contends that nothing was conveyed beyond the blue boundaries on the Exhibit N maps. [R. 86-1 at 30.] Journey, however, argues the opposite – that the PSA, Master Assignment, and the Lease taken together do not limit the conveyances to only the property within the Exhibit N

boundaries.  Simply put, the question here is what *was* conveyed.  That question addresses Journey's first two motions for summary judgment – namely, that all the conveyances were specifically listed and described on other exhibits.  The problem for both parties is that the main contractual documents do not expressly state which, if any, of the attached exhibits are controlling.  Thus, to resolve the question of what was or was not conveyed using the contract-construction principles outlined above, the Court will examine the conveyance language of each of the documents at issue together with the relevant exhibits, considering the contract as a whole and looking to interpretations that promote harmony among the various provisions.  *See L.K. Comstock & Co., Inc.*, 932 F. Supp. at 964.  In doing so, the Court will also determine whether any ambiguity exists such that extrinsic evidence should also be considered to determine the parties' intent.

**1**

To begin with, the Court notes that of the three documents at issue here – the PSA, the Master Assignment, and the 2001 Lease – the only places that reference Exhibit N and its blue map boundaries are as follows: 1) the Further Assurances clause in the PSA, 2) three footnotes in Exhibit J to the PSA, and 3) three footnotes in Exhibit A to the 2001 Lease. [R. 87-2 at 39; R. 87-8 at 16-17.]  Each of these portions will be discussed in greater detail below, but within the context of the contract as a whole.

Consequently, the logical starting point for determining what was conveyed in the agreement is not the Exhibit N maps, as EQT suggests, but rather the very first section in the PSA entitled "Property to be Sold and Purchased."  That section specifically lists five subsections describing the conveyances, some of which are not in contention here.  Section 1(a) states that EQT agrees to sell the following:

> Seller's right, title and interest in and to the oil, gas and/or mineral leases, royalty interests and overriding royalty interests described on **Exhibit A** attached hereto and made a part hereof, down to the stratigraphic equivalent of the base of the Devonian Shale formation and the right to operate and produce oil and gas from tracts in which the oil and gas rights are owned by Seller in fee, subject to the terms and conditions of the Oil and Gas Lease attached hereto as **Exhibit B** (collectively "Leasehold Interest"). . .

[R. 87-2 at 7 (emphasis in original).] This language does not reference Exhibit N or any other maps as a limitation on these conveyances, but rather indicates that the limitation, if any, would appear on Exhibits A or B to the PSA. Section 1(b) of the PSA conveys EQT's right, title and interest in the existing oil, gas, and mineral "unitization, pooling, and/or communitization agreements. . . related to the Leasehold Interest." [*Id.*] Section 1(c) conveys all of EQT's right, title and interest "in and to the wells listed on Exhibit D," and all the related materials and equipment associated with those wells. [*Id.*] The last two subsections of Section 1 convey the pipelines, meters and related facilities as described on Exhibit E, and the rights and interests to various production agreements listed on Exhibit F. [*Id.* at 8.] Thus, the language summarizing the conveyances references several of the exhibits in the context of limiting or further describing particular conveyances, but nowhere mentions or describes Exhibit N. Section 1 even ends with another paragraph expressly excluding specific aspects of the conveyances, such as the right, title and interest in all formation below the Devonian Shale formation, but does not mention any map boundaries as an exclusion or limitation on the properties conveyed. [*Id.* at 8.]

Next, the only part of the PSA that actually refers to the Exhibit N maps is called the "Further Assurances" clause, which is found in Section 18(a) of the PSA under the title "Miscellaneous Matters." [R. 87-2 at 39.] That clause, which has formed the basis of so much of the instant litigation is worth including here in its entirety, as follows:

> After the Closing, Seller and Buyer shall execute and deliver, and shall otherwise cause to be executed and delivered, from time to time, such further instruments, notices, division orders, transfer orders and other documents, and do such other and further acts and things, as may be reasonably necessary to more fully and effectively grant, convey and assign the Properties to buyer and to otherwise carry out the transaction contemplated hereby. Without limiting the foregoing, if after Closing it is determined that Seller owns other oil and gas interests or fee mineral interests within the geographic areas outlined in blue on the map attached hereto as Exhibit N which were omitted from the Assignment or oil and gas lease contemplated hereunder, Seller shall convey such interests to Buyer for no additional consideration, and the parties will otherwise proceed to take such actions with respect to such interests as would have occurred if such interests had been included in the Closing.

[R. 87-2 at 39.]  The Court finds no ambiguity either in the clear language of the above clause which states that the boundaries on the Exhibit N maps are to provide further assurances about certain existing interests Journey was purchasing, or in the contract as a whole with respect to the Further Assurances clause, as will be further explained below. Neither the clause itself nor the rest of the contract limits the conveyances to only the property within the blue boundaries on Exhibit N.  While there may be some doubt as to the parties' reasons for how the Exhibit N boundaries are drawn, the language of the Further Assurances clause which references Exhibit N and explains its purpose is quite clear.  Latent ambiguity does not exist merely because the application of a contract provision results in an outcome that one party finds unfavorable, especially when the party challenging the contract language drafted its terms.  *See First Commonwealth Bank of Prestonsburg v. West*, 55 S.W.3d 829, 836 (Ky. Ct. App. 2000) (a court is "not permitted to create an ambiguity where none exists even if doing so would result in a more palatable outcome"); *Friction Materials Co., Inc. v. Stinson*, 833 S.W.2d 388, 391 (Ky. Ct. App. 1992) (refusing to make "an ambiguity where none exists" when the agreement "is capable of interpretation without

reading any ambiguity into it" and when the party challenging the interpretation "drafted the contract and is considered the master of its words") (citing other sources).

Moreover, EQT obviously knew how to restrict acreage in various exhibits and did so when it thought it necessary, as seen by examining the other exhibits. All three of the documents at issue had various exhibits attached to them that more particularly described the specific conveyances. For instance, Exhibit A to the PSA was referenced in Section 1(a) quoted above, and it lists and describes the several hundred Third-Party Leases to be conveyed. [R. 87-2 at 56-66.] Exhibit A includes footnotes for several of the leases that expressly limit the acreage conveyed by using language such as "less and except" or "insofar and only insofar as" the particular leases contribute to acreage for particular wells, but it does not reference Exhibit N or any other map boundaries. [*Id*. at 66.] Exhibit I to the PSA was a form assignment by which the Third-Party Leases were to be eventually assigned to Journey, and although Exhibit I mentions the limit of the Devonian Shale formation, it does not mention any map or boundary outlines. Exhibit J lists and describes each of the Fee Properties that EQT offered to lease to Journey. [R. 87-6 at 34-37.] Exhibit J includes several footnoted properties for which it restricts certain acreage, again using the phrase "less and except" followed by the restriction for that specific tract. [*Id*. at 37.] Three of those endnotes do restrict the acreage to only the land within "the boundary depicted on the map attached hereto as Exhibit N." [*Id*.] However, if the boundaries on the Exhibit N maps were intended as controlling limitations on *all* the conveyances, there would be no need to reference it for only those three endnotes. Or, stated another way, why would EQT include the limitation on only three of the fee properties and not on all of them?

It is a general principle of contract construction that the specific terms are given greater weight than general language. *L.K. Comstock & Co., Inc.*, 932 F. Supp. at 967 (quoting Restatement (Second) of Contracts 203(c) (d) (1979)). As discussed above, the language in Section 1 of the PSA (Property to be Sold and Purchased) specifically conveys the interests described in more detail on Exhibits A, B, D, E, and F. [R. 87-2 at 7.] The PSA also states that the Fee Lands that will be conveyed in the Lease "are more particularly identified on Exhibit J." [R. 87-2 at 28.] The aforementioned exhibits specifically list and describe all the acreage to be conveyed and give specific limitations on that acreage where needed. A simple comparison of the language and structure of those exhibits with the general map boundaries on Exhibit N sufficiently demonstrates that the descriptions in the other exhibits at issue here (namely A and J), coupled with the conveyance language of the PSA, are far more specific, and therefore controlling, than the Exhibit N map boundaries.

This conclusion is further supported by a brief analysis of Exhibit N itself. There is no language anywhere in Exhibit N or on any maps stating or even implying that the boundaries on those maps were the controlling limitation for the entire transaction. For instance, the title for Exhibit N labels the attached maps as "EXHIBIT 'N' A MAP OF EACH FIELD FOR 'FURTHER ASSURANCES,'" [R. 87-6 at 54] thereby clearly linking it to the Further Assurances clause of Section 18(a) of the PSA rather than to the PSA's conveyance language or its description of property to be sold. Next, each of the maps in Exhibit N is labeled "Oil Sale Outlines" on the bottom of each page. [*See* R. 87-6 at 55-59; R. 87-7 at 1-6.] The agreement between Journey and EQT, however, also included selling natural gas properties and interests, rather than just oil, so the maps labeled "oil sale outlines" could not have acted as a controlling limitation on the entire transaction. Beneath the "Oil

Sale Outlines" label is a disclaimer on each map in Exhibit N cautioning that the map "reflects only the approximate location" and that the property lines and lease boundary lines are only approximate. [*See* R. 87-6 at 55-59; R. 87-7 at 1-6.] The disclaimer goes on to state that EQT "does not warrant the accuracy or completeness of the depiction." [*Id.*] The Court finds it highly unlikely that a sophisticated party such as Journey who was experienced in oil and gas production would spend over $64 million on a purchase that was based solely on approximate boundaries drawn on a series of maps. The more logical interpretation of the agreements is that the specific descriptions in Exhibits A and J to the PSA were the controlling limitations rather than the general, and admittedly approximate boundaries, on Exhibit N maps. Considered in this context, the purpose of including Exhibit N was because Journey wanted further assurances concerning the infrastructure that EQT had already developed that was within the blue lines on the map. [*See* R. 129 (Transcript) at 45-51.] The existing infrastructure was more valuable than prospective interests, and Journey saw Exhibit N as a guarantee about the most valuable part of the purchase, rather than the sole limitation or definition of the interests to be conveyed.[2] Indeed, the parts of the contract that EQT points to as support for its arguments that the conveyances were limited to properties within the blue lines are primarily legends, titles, and captions, which should not provide the basis for the interpretation of the entire contract, especially in light of the far more specific, and thus controlling, Exhibits A and J. *See L.K. Comstock & Co., Inc.*, 932 F. Supp. at 967.

---

[2] Journey further explained how it valued the conveyances during oral argument when, in response to EQT's contention that Journey did not value any interests outside the blue lines on Exhibit N, Journey explained that in the particular context EQT referenced, Journey was not attempting to value the entire transaction down to the exact dollar amount of raw acreage, but rather was trying to reassure GE Capital that its loan was based on reasonable estimates. [R. 129 (Transcript) at 44-50.] Therefore, Journey focused on the top forty percent of *existing* production from *existing* wells rather than on acreage that only had a future, *prospective* value when giving an estimate to GE Capital, and those wells were within the blue boundaries of the Exhibit N maps. [*Id.* at 45-47.] Journey concedes it is not disputing any wells outside the blue boundaries – although the existing wells drove the initial price negotiations, the present lawsuit is about the rights to exploratory drilling and interests in acreage outside the blue lines of the Exhibit N maps. [*Id.* at 47-49; *see also* R. 101 at 7.]

Additionally, there are several other flaws with EQT's insistence that the Exhibit N map boundaries controlled this transaction. For instance, the Third-Party Leases include some tracts of land in western Kentucky that are not represented at all by the Exhibit N maps (which cover only Leslie, Perry, and Letcher Counties). So, if the Exhibit N maps were the controlling limitation on the conveyances, then the other leases that are listed in the contract but are not depicted on Exhibit N maps would not be valid conveyances. Notably, EQT does not contest that the tracts in western Kentucky should not have been conveyed to Journey. Exhibit D, which lists the wells to be conveyed, also includes wells located in Crittenden and Hopkins Counties even though the Exhibit N maps do not depict any land in those counties. [R. 87-2 at 7; R. 87-4 at 17.] If the Exhibit N map boundaries were the controlling limitation on the conveyances, then the conveyance of wells listed in Crittenden and Hopkins counties would be void as well.

EQT also contends that if Journey's interpretation of the contract is correct, then EQT would own wells located on properties owned by Journey but could not enter onto those properties in order to operate its wells. [R. 86-1 at 28-29.] The contract language, however, clearly and repeatedly states that EQT retained the rights to drill below the base of the Devonian shale, and thus EQT would retain the right to enter onto the properties conveyed to Journey as long as EQT were drilling deep enough. [*See, e.g.*, R. 87-2 at 7, 8, 67, 68; R. 87-12 at 1-2.] Journey claims it is not concerned with EQT's accessing its legitimate rights but rather about EQT using land in a way it has no right to. [R. 101 at 30.]

EQT further contends that patent ambiguities exist concerning the meaning of Exhibits A, N, and J to the PSA. [R. 86-1 at 31.] For instance, because the property descriptions in the exhibits describe the properties in terms of "gross acres" rather than "net

acres," EQT argues that such language implies that the exact acreage conveyed has been omitted. [*Id*.] Additionally, EQT admits that Exhibits A and J contain "several material errors and omissions," such as listing some deeds twice. [*Id*. at 31-32.] Journey offers extrinsic evidence from EQT's own website to explain the use of "gross" rather than "net" acres [R. 101 at 28], but the Court finds no need to consider extrinsic evidence concerning this point. The fact that the exhibits did not have a column for net acres does not indicate that the parties intended some other description that was inadvertently omitted, as EQT claims, and it does not necessarily lead to two different interpretations sufficient to constitute patent ambiguity. The other so-called errors in how the deeds are listed on the exhibits also do not constitute patent ambiguity sufficient to allow admission of extrinsic evidence, as they appear to be simply EQT's own mistakes in drafting.

As for the conveyance language of the Master Assignment, it is similar to that of the PSA, and also references several attached exhibits, but it does not reference Exhibit N at all or any other map boundaries. [R. 87-12 at 1-3.] Surely, if the conveyances were limited by such boundaries, the Master Assignment, of all documents, would have mentioned it. Instead, however, the Master Assignment specifically conveyed "the oil, gas, and/or mineral leases" and royalty interests as listed on Exhibit A, with the specific exclusion of those below "the base of the Devonian Shale formation." [*Id*. at 1.] Exhibit B listed the wells and their related interests that EQT conveyed and specifically excluded two particular wells by name rather than by any map boundaries. [*Id*.] Exhibit C listed the pipelines, meters, and related facilities conveyed, with no reference to any map boundaries. [*Id*. at 2.] The only limitations in the actual language of the Master Assignment limited EQT's drilling rights to the base of the Devonian Shale formation and had some acreage-limiting endnotes on a few leases, but

did not reference the Exhibit N boundaries or any other boundaries drawn on any maps. Thus, EQT included restrictions where needed in both the PSA and the Master Assignment, but the plain language of both those documents says nothing about the Exhibit N maps as a geographic limitation on any conveyances except for the footnotes discussed above.

Finally, EQT argues that several latent ambiguities arise when considering the context of all the documents described above. A latent ambiguity generally applies where doubt exists "not as to the intention [of the party], but as to the object to which the intention applies." *Carroll v. Cave Hill Cemetery Co.*, 189 S.W. 186, 190 (Ky. 1916) (internal quotations and citations omitted). According to EQT, when the Exhibit N map boundaries are applied in the "real world," they create a latent ambiguity as to what properties and rights were conveyed by the PSA, the Master Assignment, and the Lease – namely, that the language of the documents when combined with the map boundaries are ambiguous as to whether they convey any rights to the *out*-of-boundary acreage.[3] [R. 86-1 at 32.] In particular, EQT argues that latent ambiguity exists because of "errors in and omissions from the attachments that are not apparent from the face of the writings." [R. 86-1 at 33.] However, EQT does not deny that it drafted all the documents at issue and supplied all the property descriptions and the maps. If EQT erred in its drafting, then perhaps such errors and omissions could constitute unilateral mistake, but not latent ambiguity. Moreover, even if any ambiguity did exist, ambiguities in a contract are generally construed against the drafter. *B. Perini & Sons v. Southern Ry. Co.*, 239 S.W.2d 964, 965-66 (Ky. 1951); *McMullin v. McMullin*, 338 S.W.3d 315, 322 (Ky. Ct. App. 2011) (explaining that it is "a maxim of contract interpretation that ambiguities will be construed against the drafter of a contract

---

[3] As seen from the discussion thus far, however, they do not unambiguously limit the conveyances to the *in*-boundary acreage either.

when the contract is susceptible of two meanings," and that this maxim "has long been followed in the Commonwealth" of Kentucky). As the drafter of the documents at issue, EQT could have made its alleged intention to limit conveyances to out-of-boundary properties clear from the plain language of the contract, and since it was the party in the best position to do so, it should not be able to complain when the contract language is construed against it. *See, e.g., L.K. Comstock & Co*., 932 F. Supp. at 968 (relying on the general principle recognized by Kentucky law "that a contract must be construed more strongly against the party which drafted the document").

Accordingly, the Court finds that neither patent nor latent ambiguity exists concerning the purpose of the Exhibit N boundaries, or in the language of the PSA and Master Assignment, and thus the extrinsic evidence EQT asks the Court to consider [R. 86-1 at 33-38] is inadmissible to establish the parties' intent concerning the meaning of these documents.[4] Instead, the Court must rely on the plain language of the documents when interpreting them. In doing so, the Court finds that the contractual language does not limit the conveyances to the property *only* within the Exhibit N map boundaries.

**2**

In light of the above analysis, the Court also finds that in the context of Journey's first and second motions for partial summary judgment, no ambiguity exists as to the meaning of the Further Assurances clause and its reference to the Exhibit N maps. Rather, the plain language of Section 18(a) of the PSA operates as a clear guarantee that EQT must convey to Journey any other "oil and gas interests or fee mineral interests *within* the geographic areas outlined in blue on the map" attached as Exhibit N if those interests were somehow omitted.

---

[4] The language of the 2001 Lease and its exhibits is discussed separately below.

[R. 87-2 at 39 (emphasis added).]  Pursuant to that language, EQT must convey those interests, if omitted, for no additional consideration.  [*Id*.]

Journey's first motion for partial summary judgment argues that Journey has breached the Further Assurances clause of the PSA Section 18(a) by not conveying all promised interests that lie *within* the blue-outlined boundaries on the Exhibit N maps and must therefore compensate Journey for the net revenues EQT has been receiving from those properties since 2001.  [R. 87 at 3; R. 87-1 at 4.]  Given the above discussion of EQT's own motion for summary judgment, we begin with the understanding that EQT at the very least agrees that it conveyed to Journey the properties *within* the blue boundaries on the Exhibit N maps.  Although EQT contends that it conveyed nothing outside those boundaries, EQT does not appear to dispute that the property *inside* the Exhibit N boundaries *was* to be conveyed to Journey.  [*See* R. 86-1 at 1, 6-7, 9, 23, 33-34.]  Indeed, EQT even argues that it sold Journey only the in-boundary wells, and the in-boundary pipelines and facilities.  [R. 86-1 at 28-29.]  Although the Court disagrees that the conveyances were limited to *only* the in-boundary assets, EQT's own arguments demonstrate that there is no genuine dispute that at the very least, the in-boundary property, wells, and related interests were conveyed to Journey.

This conclusion is also clear from the language used in the Further Assurances clause itself, as quoted above.  The clause clearly operates to assure the buyer that everything within the Exhibit N boundaries is and should be conveyed, and if by some oversight such interests are not conveyed, the seller is contractually obligated to remedy that oversight at no additional cost to the buyer.  [R. 87-2 at 39.]  As explained previously, the Further Assurances clause is also not part of the list of express warranties on which Section 17 of the

PSA imposed a one-year limit following the closing.[5]  Accordingly, the Court finds that EQT must convey to Journey any oil or gas interest, fee mineral interest, or oil and gas lease "within the geographic areas outlined in blue" on the maps attached to the PSA as Exhibit N, as required by the plain language of Section 18(a) of the PSA.  [R. 87-2 at 39.]

Journey's first motion for partial summary judgment also argues that EQT must compensate Journey for all past net revenues from wells of mineral interests located within the blue boundaries on Exhibit N maps that were not conveyed to Journey as required by the PSA.  [R. 87-1 at 35-37.]  As quoted above, the Further Assurances clause states that in the event it is discovered after closing that the seller (EQT) has failed to convey all the interests within the blue boundaries, the seller must not only convey those interests to the buyer without additional consideration, but the parties are also required to "otherwise proceed to take such actions with respect to such interests as would have occurred if such interests had been included in the Closing."  [R. 87-2 at 39.]  Journey argues that an example of actions that "would have occurred" if the proper interests had been included at closing is the conveyance of several months of interim revenues and expenses accrued between the effective date of the transaction on July 1, 2001, and the day of closing on November 30, 2001.  [R. 87-1 at 36.]  Provision for such interim revenues and expenses was included in Section 12(a), (b), and (c) of the PSA for the conveyed properties and interests, [R. 87-2 at 32-34] and Journey contends that it can be extrapolated from this provision that EQT should now compensate Journey for all past revenues from the day of closing until the present time for any properties that EQT failed to convey as required by Section 18(a).  [R. 87-1 at 36-37.]

---

[5]   The express representations and warranties in the PSA were listed and described in separate sections with separate headings  [*See, e.g.,* R. 87-2 at 9-14 (Section 4(a) and 4(b)); R. 87-2 at 14(Section 5)], and also included a disclaimer in all caps stating that the seller's express representations and warranties listed in Section 4(a) were "EXCLUSIVE."  [R. 87-2 at 12.]  In contrast, the Further Assurances clause is listed under "Miscellaneous Matters" in a separate part of the contract.

However, it is not clear that the types of accounting adjustments described in Section 12 also contemplate possible adjustments related to the Further Assurances clause. Section 12 deals for adjustments both for revenues as well as for expenses and taxes during the transition between buyer and seller that would necessarily take some time, but such adjustments seem unrelated to the content of the Further Assurances clause in Section 18(a). Additionally, to use Section 12 in the way that Journey requests would also mean that any expenses, taxes, and other maintenance costs related to the properties at issue must be subtracted from any revenues owed to Journey. Moreover, if Section 12(a) can be used to support Journey's claim for past revenues, there is at least a colorable argument that the limitation in Section 12(d) stating that "no further adjustments shall be made under this Section 12" for items that come to the attention of the parties longer than one year past closing could also apply to bar Journey's present claims for lost revenue that were made over a decade past closing. [*See* R. 87-2 at 34; R. 100 at 28-29.] Section 12 also requires the parties to review information to determine if any additional adjustments should be made beyond those made at closing. [R. 87-2 at 34 (§12(c)).] On a related note, EQT raises another argument that Journey perhaps bears some fault in the matter for not discovering the breach earlier, and that perhaps the breach did not occur on the day of closing, but rather at some later date when it was clear that EQT was in breach. [R. 100 at 29-30.] Nevertheless, even apart from Section 12, common sense would seemingly support the assumption that if the omitted properties had been conveyed to Journey at closing as the PSA intended, the net revenues obtained between the effective date and the closing date would also have been transferred to Journey. Yet in light of the arguments outlined above, there remains a genuine issue of fact as to whether EQT must pay those revenues for the entire period between July

2001 and the present, as well as the possible applicability of Section 12 to the instant dispute. Thus, the Court finds that the amount of past revenues, if any, that are owed to Journey as a result of the breach, and particularly whether Journey is at fault for not discovering the breach until several years after the contracts were complete, are issues of fact that are better left to a jury.

**3**

The Court finds, however, that the argument for the existence of ambiguity is stronger with respect to the language used in the 2001 Oil and Gas Lease, particularly concerning the relationship between Exhibit A and Exhibit A-1 to the Lease, which thus merits a separate discussion. Specifically, in the section of the Lease entitled "Description of Lands," the Lease language reads as follows:

> The lands covered hereby are situated in Leslie, Letcher and Perry Counties, in the Commonwealth of Kentucky and are more particularly described on Exhibit "A" and shown on Exhibit "A-1" (Map) each of which are attached hereto and made a part hereof (the "Leased Premises"). Exhibit A specifies the number of acres contained in each separate and distinct tract ("Tract") comprising the Leased Premises and for the purpose of this Lease, such acreage designations shall be deemed to be correct, whether actually more or less.

[R. 87-8 at 2.] Exhibit A attached to the Lease is a detailed spreadsheet listing and describing over one hundred various tracts of land conveyed by the Lease. [R. 87-8 at 14-17.] Only three of those tracts were footnoted with a specific restriction stating "Less and except all acreage lying outside the boundary depicted on the map attached hereto as Exhibit 'N.'" [R. 87-8 at 17.] One problem, however, is that no Exhibit N was attached. Instead, the only other attachment to the lease was the above-referenced Exhibit A-1. [*See* R. 87-8 at 18-29.] Exhibit A-1 is titled "EXHIBIT A-1 TO OIL AND GAS LEASE MAP OF FEE LANDS." [R. 87-8 at 18.] The only description of it says that "[t]he maps attached hereto

cover any and all Fee Lands located within the blue boundaries that are currently owned by EPC and more particularly described on Exhibit A." [*Id.*] The rest of Exhibit A-1 consists of maps that appear to be the same maps as those in Exhibit N to the PSA.

EQT takes the position that the above-quoted language in the Lease saying ". . . and shown on Exhibit A-1 (Map) each of which are attached and made a part hereof. . ." [R. 87-8 at 2], coupled with the language in the title of Exhibit A-1 about the maps covering the properties located within the blue boundaries, operate as evidence that the map boundaries in Exhibit N to the PSA (and in Exhibit A-1) have "controlling impact" over the conveyance wherever any of the other exhibits list acreage located outside those boundaries. [R. 104 at 3-4.] According to EQT, this language in the Lease means that EQT conveyed nothing to Journey that was not within those boundaries. [R. 100 at 5.]

As previously explained, such language does not unambiguously limit the entire transaction to the map boundaries, but the more pertinent question is whether the Court must inquire into the parties' intent here because the language is ambiguous. At first blush, there may appear to be a latent ambiguity in this language to the extent that the descriptions in the spreadsheet attached as Exhibit A differ from or contradict the map boundaries in Exhibit A-1, and because of the fact that the footnotes in Exhibit A reference "Exhibit N" which is not attached. Additionally, because the designations "A" and "A-1" could arguably be considered two parts of the same Exhibit, or because the Lease at least implies that Exhibits A and A-1 correspond with each other, the fact that they differ in certain respects could create some measure of ambiguity. However, this potential confusion can be resolved without resort to extrinsic evidence by looking at the rest of the language in the Lease itself, as well as considering the documents related to the overall transaction in its entirety.

First, the granting clause on the first page of the Lease stated that EQT "does hereby grant, demise, lease, and let unto Lessee . . . those certain tracts of land . . . as more specifically described in the [PSA]." [R. 87-2 at 1.] As discussed above, those tracts were described in the listing attached to the PSA as Exhibit A, but were not described or otherwise limited by boundaries drawn on a map. The granting clause of the Lease itself does not reference map boundaries or other geographic limitations other than the Devonian Shale limitation. [*See id*.]

Second, the language in the "Description of Lands" on the second page of the Lease quoted above does not limit the leases to maps. To say that the leases are "more particularly described on Exhibit A" and "shown on Exhibit A-1 (Map)" does not mean that they are *only* located within the map boundaries, particularly when the language also explains which designation is controlling. [*Id*. at 2.] For instance, EQT selectively quotes language from the first sentence about the lands being "shown on Exhibit A-1 (Map)" but fails to note the very next sentence, which reads as follows:

> *Exhibit A* specifies the number of acres contained in each separate and distinct tract . . . and for the purpose of this Lease, *such acreage designations shall be deemed to be correct*, whether actually more or less.

[*Id*. at 2 (emphasis added).] A few lines later in the Lease's first section titled "Term," the parties "mutually agree and covenant" that the Lease "shall be and remain in force *as to each particular tract as set forth on Exhibit A* leased hereunder . . ." which again does not reference any map boundaries. [R. 87-8 at 2 (emphasis added).] Even if one argues that Exhibits A and A-1 are two parts of the same Exhibit – Exhibit A – the language specifically states that the listed acreage designations are controlling in the event of a discrepancy. Moreover, the caption on the Exhibit A-1 maps contains the same disclaimer about the

boundaries being approximate that was on the Exhibit N maps. Thus, to the extent that the boundaries on Exhibit A-1 to the Lease differ from the acreage descriptions on Exhibit A, the acreage descriptions control rather than the blue boundaries.[6] *See L.K. Comstock & Co., Inc.*, 932 F. Supp. at 967 (quoting Restatement (Second) of Contracts 203(c) (d) (1979)).

Third, as with Exhibit A to the PSA, the existence of the three footnotes in Exhibit A to the Lease that reference the map's blue boundaries as an express limitation on the acreage begs the question as to why such a limitation was included for only those three footnotes, or even why it was included at all if the contract plainly limits all of the leases to the tracts within the blue boundaries. Once again, if the maps on either Exhibit N or Exhibit A-1 control limitations on all conveyances, there is no logical reason for the few footnotes expressly limiting particular conveyances to those boundaries. EQT admits that the footnote references may result from drafting errors that also include the odd reference to Exhibit N when there was no Exhibit N attached, and the fact that Exhibit N and Exhibit A-1 had the same maps. None of these so-called drafting errors, however, constitute ambiguity sufficient to overcome the plain language of the other documents. To the extent that drafting errors exist in the Lease, the Court should construe such errors against the drafter, and should interpret any ambiguity caused by those errors against EQT. *Dunbar v. R.E. Williams Co*., 358 S.W.2d 536, 538 (Ky. 1962) (finding that where lease provisions "are inconsistent and create an ambiguity, the rule is that the lease shall be construed more favorably to the lessee and more strongly against the lessor) (citing other sources); *see also Morganfield Nat. Bank v. Damien Elder & Sons*, 836 S.W.2d 893, 896 (Ky. 1992) ("The Court construes the written

---

[6] This conclusion is further supported by the Memorandum of Lease that was recorded in Leslie, Letcher, and Perry Counties, which each included the relevant Exhibit A acreage descriptions for the tracts in that county but notably did not include any maps from Exhibit A-1. [*See* R. 87-9; R. 87-10; R. 87-11.]

instrument against the party who prepared the agreement. . . and in a case of both questionable [or] doubtful construction, resolves such doubt against [the drafter]"); *Coomer v. Gray*, 750 S.W. 2d 424, 426 (Ky. 1988) (applying Kentucky contract principles to find that when an ambiguity due to error exists the contract must be construed against the drafter).

**4**

Journey's second motion for partial summary judgment requests that the Court construe the PSA, the Master Assignment, and the EQT Lease to find that 1) the PSA assigned Journey all of EQT's right, title, and interest in the Third-Party Leases described in Exhibit A to the PSA, and to lease to Journey the fee mineral interest in the Fee Properties as described in Exhibit J to the PSA; 2) that the Master Assignment conveyed all of EQT's right, title, and interest in the Third-Party Leases as described in Exhibit A to the Master Assignment; and 3) that the 2001 Lease conveyed EQT's entire interest in the leasehold estate to EQT's oil, gas, and mineral interests in the tracts described in Exhibit A to the Lease. [R. 88 at 2.]  In light of the above analysis, the Court finds that the plain language of the PSA, the Master Assignment, and the 2001 Lease unambiguously convey the interests that Journey argues they do.

EQT's other arguments about the parties' subsequent course of conduct, how the documents at issue were evaluated before signing them, and how value was assigned to the various parts of the conveyance not only fail on their merits, but are inadmissible as extrinsic evidence where the Court finds that no ambiguity exists.  Indeed, the fact that EQT primarily bases its line of argument on assertions about the parties' intent, which can only be considered if the contract is ambiguous, further supports the fact that neither the PSA, Master Assignment, nor the Lease unambiguously limit the sale to the Exhibit N map boundaries.

Thus, the primary dispute merely amounts to a disagreement about how the unambiguous language of the contracts should be interpreted, but "[t]he fact that one party may have intended different results . . . is insufficient to construe a contract at variance with its plain and unambiguous terms." *Abney v. Nationwide Mut. Ins. Co*., 215 S.W.3d 699, 703 (Ky. 2006) (quoting *Cantrell Supply*, 94 S.W.3d at 385). EQT has not presented any evidence demonstrating that the conveyance language of the contracts should be interpreted in a different way than is indicated by their plain language, either in its own motion for summary judgment, or in its response to Journey's motions. Although in relation to Journey's motions, EQT has the lesser burden as the non-moving party, even the non-movant must still show some evidence of a genuine dispute once the moving party has met its burden. *Hall Holding*, 285 F.3d at 424 (citing *Celotex Corp.*, 477 U.S. at 324). Accordingly, for these reasons, EQT's motion for summary judgment is denied with respect to its arguments concerning ambiguity, and Journey's first two motions for partial summary judgment are granted except for the issue concerning the amount of past revenues.

### E

In EQT's answer to Journey's third amended complaint, EQT claims as a defense that neither Journey nor EQT ever intended for EQT to convey to Journey "any portion of the leases listed on Exhibit A to the [PSA] outside the boundaries of Exhibit N" or "any portion of the fee tracts listed on Exhibit A to the 2001 Lease which were outside the boundaries of Exhibit A-1 to the 2001 Lease," and that if any document implies otherwise, it was the result of a mutual mistake. [R. 68 at 4, ¶ 20.] EQT also claims that to the extent that the PSA could be construed otherwise, the Court should reform the PSA in order to reflect that EQT's conveyance was limited to the tracts *within* the boundaries of Exhibit N. [*Id*. at 8.] EQT also

asks the Court to reform the 2001 Lease to the extent that it does not limit the conveyance of property within the oilfield properties defined by Exhibit A-1, and to the extent that it does not require Journey to drill a producing well on each tract during the primary term in order to retain that tract after the primary term expired. In Journey's third motion for partial summary judgment, Journey contends that summary judgment should be entered in Journey's favor on EQT's affirmative defense of mutual mistake and on EQT's related reformation counterclaim. [R. 89 at 1.]

A court may reform a written agreement "where, due to a mutual mistake by the parties, the instrument as drawn does not accurately express the true intention or agreement of the parties." *Nichols v. Zurich Am. Ins. Co*., 423 S.W.3d 698, 702-03 (Ky. 2014) (quoting 66 Am. Jur. 2d *Reformation of Instruments* §20 (2013)). For a court to alter the terms of a contract in order to correct a mutual mistake of fact, the party seeking reformation must prove three things – first, that "the mistake was mutual, not unilateral"; second, the "mutual mistake must be proven beyond a reasonable controversy by *clear and convincing evidence*"; and third, "it must be shown that the parties had actually agreed upon terms different from those expressed in the written instrument." *Nichols*, 423 S.W.3d at 702-03 (Ky. 2014) (quoting *Abney v. Nationwide Mut. Ins. Co*., 215 S.W.3d 699, 704 (Ky. 2006) (emphasis in original)). In this case, EQT has nowhere discussed the legal standard it must prove to establish a defense of mutual mistake, nor has EQT met the standard of proof for any of the three required elements.

First, and perhaps most importantly, EQT has not shown that any mistake in the drafting was the mistake of *both* parties, or that both parties intended something different from the contract's natural result. To obtain reformation, EQT must prove that the alleged

mistake was indeed "the mistake of both parties." *Nichols*, 423 S.W.3d at 704 (quoting 66

Am. Jur. 2d *Reformation of Instruments* §20). Both parties must have "labor[ed] under the

same misconception respecting a material fact, the terms of the agreement, or the provision

of a written agreement designed to embody such an agreement. . . . *The mistake cannot be*

*mutual if the minds of the parties did not meet in a common intent*." *Id.* (quoting 66 Am. Jur.

2d *Reformation of Instruments* §22) (emphasis in original).

Here, EQT argues extensively that the testimony of certain employees presented by

Journey is not relevant and does not support Journey's arguments. [*See* R. 100 at 15-20.]

While EQT is correct that the testimony of EQT employees about their lack of memory or

knowledge concerning the Exhibit N boundaries is irrelevant to the mutual mistake claim,

EQT's burden in this matter is to prove that *Journey* knew and intended for the conveyances

to be limited by the Exhibit N map boundaries at the time the parties made the agreement.

To prove this knowledge, EQT's line of argument must focus on Journey's knowledge and

intent, not just EQT's. For instance, EQT points to the testimony from its vice president of

Geo Science, Joseph Morris, who testified that EQT Vice President Lester Zitkus came to

Morris' office and drew on a map the boundaries of land that EQT would offer for sale.[7] [R.

100 at 18.] According to Morris' testimony, those map boundaries, rather than the lists of

deeds and leases, were what he considered "the crucial identification of the sale assets," and

that the acreage and oil wells within those boundaries were what EQT intended to sell. [*Id.*

---

[7] EQT primarily relies on parol evidence in its argument that a mutual mistake occurred, and asserts that courts are permitted to examine extrinsic evidence when analyzing mistake claims. [R. 100 at 22, n. 58.] The case to which EQT cites in support of this contention, however, explains that contracts may be reformed based on parol evidence when there is evidence of a "scrivener's error" that is "clear, precise, convincing and of most satisfactory character," and that "the mistake does not reflect the intent of the parties." *Cadleway Properties, Inc. v. Bayview Loan Serv., LLC*, 338 S.W.3d 280, 287 (Ky. Ct. App. 2010) (quoting *A.H. Thompson Co. v. Security Ins. Co.*, 67 S.W.2d 493, 495 (Ky. 1933)). Here, there is no such evidence. EQT's better argument is that courts may choose to look to parol evidence to resolve claims of mutual mistake. *In re Thirteenth Floor Entertainment Center, LLC*, 507 F. App'x 473, 477 (6th Cir. 2012).

at 19.]  Very well, this testimony provides some evidence of *EQT's* intent, but it says nothing about Journey's understanding of the agreement, and thus only shows a unilateral rather than mutual mistake.  *See Nichols*, 423 S.W.3d at 703.

EQT next attempts to provide evidence of Journey's knowledge and intent by pointing to a fax from Journey employee Greg Shockley to Journey's former president Brian Baer summarizing a meeting between Shockley and EQT representative Sam Smallwood that occurred on August 11, 2006.  [R. 100 at 21.]  However, the language that EQT claims is evidence of mutual mistake merely states that when discussing the Fordson Tract, Journey "never claimed the portion in Letcher County," and that although this understanding probably should have been made clear in the original agreement Shockley was "willing to execute some type of letter agreement" to that effect.  [*Id.*]  EQT further points to an email sent by Journey to EQT in 2009 that notes the existence of several errors and omissions in the PSA but acknowledges that the parties "have always been able to work [things] out in the past."  [*Id*. at 21-22.]  These messages, however, only address one part of the Fordson tract in Letcher County.  They do not say anything about Journey's understanding of the other conveyances at issue in this case.  Moreover, they also are dated several years after the agreement was signed and cannot be said to provide *clear and convincing* evidence of what both parties intended in 2001.

EQT also contends that the parties' conduct after closing provides evidence of mutual mistake, specifically pointing to the allegation that Journey did not assign value to assets outside Exhibit N boundaries, the alleged similarity of a simultaneous deal between Journey and KRCC in which conveyances were limited by map boundaries, the fact that Journey did not drill wells outside Exhibit N boundaries, and the language Journey used in 2008 when

attempting to sell its Kentucky properties using map boundaries similar to the Exhibit N maps. [R. 100 at 22-25.] First, the Court has already noted Journey's adequate explanation about how it valued the assets in the agreement with EQT, and such value determinations are not indicative of mutual mistake concerning the meaning of Exhibit N. Next, the deal between Journey and KRCC was a separate agreement, and comparison of the documents between the two is not helpful to EQT's position.[8] As for EQT's other arguments, they relate to subsequent conduct rather than showing Journey's intent at the time it entered into the 2001 agreement.[9] Thus, EQT has not demonstrated that the mistake was mutual, nor provided clear and convincing evidence of such a mistake, and EQT has not even attempted to show evidence of an actual *agreement* that was different from the 2001 contract.

Even apart from this failure, EQT has shown that it also likely failed to exercise due diligence on its part to prevent mistakes in the agreement, and thus cannot obtain reformation. Kentucky courts have held that "the reformation of a contract, as a relief, will not be afforded where the complaining party is negligent. The law will not interfere to protect one from the result of its own negligence." *Mayo Arcade Corp. v. Bonded Floors Co.*, 41 S.W.2d 1104, 1109 (Ky. 1931). The court in *Mayo Arcade* went on to explain that the very term "'mistake' carries with it the idea of fault in him to whom the mistake is imputed," and that although the mere fact that a mistake was made does not necessarily mean that any party was negligent, "equity does require that the party who seeks [reformation] on

---

[8]   Indeed, the PSA involved in the KRCC deal actually contains a sentence in the part of the PSA defining the conveyances that specifically excepted certain land located outside of map boundaries – a specific exception that is absent from the deal with EQT. [*See* R. 86-15; R. 105 at 14.]

[9]   Even in looking at subsequent conduct of the parties, Journey points out that in 2006, Mr. Shockley answered an inquiry from a prospective lessor concerning the "Lloyd Slusher" lease by saying that Journey held by production all 1,350 acres even though most of that acreage was outside the Exhibit N boundaries. [R. 100 at 13.] Also in 2006, Mr. Shockley handled a "farmout" arrangement of the same lease to Nami Resources involving tracts outside Exhibit N boundaries. [R. 100 at 13-14; R. 78 at 98-99.]

the ground of mutual mistake shall have at least exercised the degree of diligence which may be fairly expected from a reasonable person." *Id.*; *see also Gray v. First Nat'l Mtg. Co., Inc. of Evansville*, 2003 WL 134370, at *11 (Ky. Ct. App. Feb. 21, 2003) (noting that "Kentucky's courts have insisted on" this minimal degree of diligence). In seeking reformation on the basis of mutual mistake, "where one party has acted negligently in failing to ascertain the facts or obtain the information that could have corrected the mistake, that party is not entitled to relief." *Fifth Third Bank v. Lincoln Fin. Secs. Corp.*, 453 F. App'x 589, 600 (6th Cir. 2011) (citing to Kentucky law in *Allen Lumber Co. v. Howard*, 72 S.W.2d 483, 487-88 (Ky. 1934)). Here, EQT is a highly sophisticated entity in the business of oil and gas production, and given its admitted errors and omissions in drafting the documents at issue, reformation does not appear to be an appropriate remedy.

Finally, EQT also claims that to the extent that the 2001 Lease could be construed to allow Journey to retain leased tracts on which it had not drilled a producing well by 2006, the Lease should be reformed to more clearly require Journey to have drilled a new producing well in order to extend the primary lease term of any given tract. The Court notes, however, that EQT has not specifically argued that a mutual mistake occurred concerning the terms of the 2001 Lease. Neither EQT's affirmative defenses nor its counterclaims specifically pled that the Lease provision about Journey's drilling obligation result from a mutual mistake, nor does EQT present any evidence as to mutual mistake concerning the Lease's requirements for extending the primary term. Journey's third motion addresses this omission when arguing that summary judgment should be entered in its favor on EQT's reformation counterclaim. [R. 89-1 at 2, 5-6.] Although EQT's responsive brief argues that ambiguity may exist concerning Journey's primary term obligation [R. 100 at 32], EQT does not

address whether a mutual mistake occurred concerning the alleged drilling requirements, and thus cannot prove the elements necessary to obtain reformation. For all these reasons, any mistake was only unilateral and not mutual, and therefore the Court will grant Journey's motion for summary judgment concerning EQT's mutual mistake and reformation claims.

**F**

Journey's fourth motion for partial summary judgment requests that the Court enter summary judgment in its favor on ¶15 of EQT's counterclaim [R. 68 at 8], in which EQT requests a declaratory judgment that Journey was required to drill a producing well on any tract covered by the 2001 Lease in order to retain the tract after the primary term expired. [R. 90.] Journey moves for summary judgment on this counterclaim, arguing that the plain language of the Lease does not require Journey to drill new wells during the primary term in order to hold a tract by production. [R. 90-1 at 7-8.] This portion of the parties' dispute depends on the contract-construction principles explained above and is easily resolved by the plain language of the Lease. Under the first numbered section of the 2001 Lease, entitled "TERM," the Lease describes the conditions that make up the primary term of the Lease and the ways Journey may extend it as follows:

> . . . this Lease shall be and remain in force as to each particular tract. . . for a primary term of five (5) years ("Primary Term") *and for so long thereafter as oil or gas is produced in paying quantities*, with respect to each particular tract, from such tract or from leases or lands pooled with such tract, or drilling, or reworking or other operations are continued as provided herein. If after the end of the Primary Term should all wells on any particular tract cease to produce in paying quantities, this Lease shall terminate as to all acreage for that particular tract.

[R. 87-8 at 2 (emphasis added).] That section goes on to explain that if "after the end of the Primary Term should all wells on any particular tract cease to produce in paying quantities," the Lease would terminate as to that particular tract *unless* a new well was drilled on that

tract within one hundred and twenty days after production from all wells on that particular tract had ceased. [*Id.*] As long as production in paying quantities continued, however, whether or not from new drilling, the primary term would be automatically extended.

Here, EQT argues that the generally accepted definition of "primary term" required Journey to drill a new well during the first five years in order to retain the tracts afterward, and that Journey erroneously focuses on the requirements for the secondary term of the 2001 Lease instead. [R. 100 at 30-31 (citing *Williams and Meyer's, Oil and Gas Law*, Vol. 8, at 804 (LexisNexis Matthew bender 2012)).] The definition EQT gives, however, does not correspond with the language actually used in the 2001 Lease, particularly because the Lease conditions for extending the primary term focus on whether there is production in paying quantities, and then lists several ways in which that can occur, only one of which includes new drilling. Whether or not Journey drilled a new well during the five-year primary term, EQT points to no language in the Lease requiring Journey to drill a new well in order to extend the Lease, as long as production continued from one of the other methods.

Most importantly, however, regardless of a treatise definition of "primary term," the primary reason that EQT's argument fails is that EQT has not established, nor even alleged, that any particular leased tracts are no longer producing in paying quantities. Even if Journey were required to drill such a well before 2006, the lease of a particular tract would end only if production in paying quantities from all wells on the tract ceased. Yet EQT has not provided evidence showing which tracts are devoid of all producing wells, or that any tract has ceased production. The only support EQT offers for its declaratory judgment request is the above-mentioned definition with no application of that definition to the context of this case. Finally, although EQT attempts to argue that ambiguity exists as to whether drilling a new

well was required [R. 100 at 32], the plain language of the Lease contains no drilling requirement as long as production continues by one of the other listed means. Accordingly, summary judgment will be granted in Journey's favor on this claim as well. The Court also notes that although Journey's fourth motion did not specifically address EQT's damages claim, the above finding necessarily result in the failure of EQT's counterclaim [R. 68 at 9, ¶ 20] for damages as well, to the extent that such damages would be due to Journey's alleged trespass and conversion of leased wells it continued to operate after 2006 without having drilled new producing wells.

## G

EQT's remaining claims include its contention that the Court should grant summary judgment in its favor on Journey's claims against EQT for trespass and conversion. In support, EQT contends that because EQT owned the land at issue it did not commit trespass, but in the alternative, EQT argues it was merely an "innocent" trespasser rather than a willful trespasser. [R. 86-1 at 43-44.] Given the above findings that the documents at issue conveyed the land to Journey, the Court cannot grant summary judgment on the issue of trespass or conversion to EQT. However, in the absence of evidence concerning the exact dates and details of alleged trespass on the part of EQT, the question of how or when EQT may have committed trespass or conversion, any resulting damages of the trespass, and particularly EQT's intent as a willful or merely a "negligent" trespasser, all involve factual and credibility determinations better left to a jury.

As for EQT's claim that Journey is not entitled to prejudgment interest on past net revenues, EQT merely asserts without any proof that because its own conduct was done with a "good-faith belief that it was right," and because Journey "slept" on its claim for many

years, Journey is not entitled to prejudgment interest. [R. 86-1 at 44-45.] The basis for this claim, however – EQT's subjective belief about its actions and Journey's subjective knowledge about its rights – has not been litigated sufficiently for the Court to determine. It may be that Journey is not entitled to prejudgment interest, but at this stage of litigation, and in the absence of any other facts presented in support of this argument, there clearly remains a genuine dispute as to both parties' subjective beliefs and knowledge about the contractual rights at issue such that summary judgment cannot be granted. The reasoning behind this conclusion also applies to Journey's first motion for partial summary judgment to the extent that it requests prejudgment interest on past revenues.

## III

In conclusion, the Court finds that the documents at issue should be construed in the way that Journey contends in its four motions for partial summary judgment, and such motions will be granted accordingly. Journey's first motion for partial summary judgment, however, will be denied in part to the extent that there remains a genuine issue of material fact concerning whether Journey is entitled to recover net-revenue amounts from EQT plus prejudgment interest, and the amount of such revenues or other damages for EQT's breach, if any. Given the above findings, EQT's motion for summary judgment on its declaratory claims asserted in its counterclaim to Journey's third amended complaint is denied. EQT also requests summary judgment in its favor on "all claims in Journey's Third Amended Complaint" [R. 86-1 at 1], but EQT has not discussed or otherwise presented arguments concerning several of those claims. Therefore, to the extent that any other claim asserted in Journey's third amended complaint has not been resolved herein, EQT's motion for summary judgment concerning that claim is denied since no evidence has been presented to

demonstrate the lack of a genuine factual dispute. *See Hall Holding*, 285 F.3d at 424.

Accordingly, and the Court being otherwise sufficiently advised, it is hereby **ORDERED** as follows:

1.      EQT Production Company's Motion for Summary Judgment [**R. 86**] is **DENIED**;

2.      EQT's accompanying Motion for Leave to File Excess Pages [**R. 85**] is **GRANTED**;

3.      Journey Acquisition's First Motion for Partial Summary Judgment [**R. 87**] is **GRANTED in PART and DENIED in PART** consistent with the findings of this opinion;

4.      Journey Acquisition's Second Motion for Partial Summary Judgment [**R. 88**] is **GRANTED**;

5.      Journey Acquisition's Third Motion for Partial Summary Judgment [**R. 89**] is **GRANTED**;

6.      Journey Acquisition's Fourth Motion for Partial Summary Judgment [**R. 90**] is **GRANTED**; and

7.      This matter will remain on the Court's active docket pending resolution of the remaining issues, and thus the dates for the Final Pretrial Conference and the Jury Trial will remain as scheduled.

This 18th day of August, 2014.



Signed By:

*Gregory F. Van Tatenhove*

**United States District Judge**