UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
LONDON

| | | |
|---|---|---|
| JOURNEY ACQUISITION-II, L.P., | ) | |
| | ) | Civ. No: 12-108-GFVT |
| Plaintiff, | ) | |
| | ) | **MEMORANDUM** |
| V. | ) | **OPINION** |
| | ) | **&** |
| EQT PRODUCTION COMPANY, | ) | **ORDER** |
| | ) | |
| Defendants. | ) | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

This matter is before the Court upon the Motion of Plaintiff Journey Acquisition-II, L.P.

(Journey) for Entry of Judgment and Proposed Findings of Fact and Conclusions of Law under

Federal Rule of Civil Procedure 52 [R. 204], and for Defendant EQT Production Company

(EQT)'s corresponding motion for entry of judgment in its own favor [R. 198].[1]  For the reasons

explained below, and the reasons explicated in the Court's most recent Memorandum Opinion in

this case at Docket Entry No. 220, which is incorporated here by reference, Journey's motion

will be GRANTED IN PART and DENIED IN PART.

**I**

**A**

This case arises out of a contractual dispute between Journey and Defendant EQT

Production Company (EQT).  In 2001, EQT and Journey entered into a contract by which EQT

agreed to sell, lease, and otherwise transfer certain lands as well as certain interests in oil, natural

---

[1] EQT included its arguments concerning entering judgment under Rule 52 within its motion for a new trial and
motion for judgment as a matter of law.  For the sake of clarity, the Court ruled on those portions of EQT's motion
in a separate memorandum opinion [R. 220], and will now address the arguments concerning EQT's equitable
defenses within the context of the present Memorandum Opinion.

gas, mineral rights, and related assets connected to several large tracts of land located in southeastern Kentucky – mainly in Letcher, Perry, and Leslie Counties.  The parties dispute which property and interests were conveyed.  The disputed properties include tracts of land that EQT owned, lands and interests that EQT leased from third-party owners, and several hundred existing wells and their associated equipment and operations.  The Court has previously set forth the factual and procedural background of this case in its Memorandum Opinion and Order on the parties' summary judgment motions [R. 141] and in its Memorandum Opinion and Order denying EQT's post-trial motions [R. 220], both of which are incorporated here by reference.

After a week-long jury trial, the jury rendered a binding verdict rejecting EQT's affirmative defense of innocent trespass.  The Court denied EQT's motion for judgment as a matter of law and for a new trial concerning that issue, and thus the Court will uphold the jury's verdict as to the issue of bad-faith trespass for the reasons set forth in the Court's previous opinion.  [*See* R. 220.]  Concerning EQT's equitable defenses, however, the jury acted in an advisory capacity when it rejected the defenses of laches, waiver, and estoppel.  Under Federal Rule of Civil Procedure 52(a), the Court must now enter its own findings of fact and conclusions of law concerning the advisory portion of the jury's verdict.

Federal Rule of Civil Procedure 39(c) provides that the court may use an advisory jury to try any issue not triable of right by a jury.  Fed. R .Civ. P. 39(c).  "It is within the discretion of the trial court to accept or reject the verdict of an advisory jury."  *Hyde Properties v. McCoy*, 507 F.2d 301, 306 (6th Cir. 1974).  When a jury acts in an advisory capacity, the court is not bound to accept the jury's verdict but is required to render its own findings of fact and state its conclusions of law.  Fed. R. Civ. P. 52(a) ("In an action . . . with an advisory jury, the court must find the facts specially and state its conclusions of law separately."); *Pennington v. Western*

2

*Atlas, Inc.*, 202 F.3d 902, 906 (6th Cir. 2000) (quoting other cases citing Fed.R.Civ.P. 52(a)); *see also Hickory Specialties, Inc. v. Forest Flavors Int'l, Inc.*, 215 F.3d 1326, *7 (6th Cir. May 19, 2000), *unpublished decision* (quoting *Ellis v. Diffie*, 177 F.3d 503, 505 (6th Cir. 1999)).

In doing so, the trial court's findings should be both "comprehensive and pertinent to the issues to provide a basis for decision." *Deal v. Cincinnati Bd. of Ed.*, 369 F.2d 55, 63 (6th Cir. 1966) (internal quotation marks omitted); *see also Wright v. General Motors Corp.*, 793 F.2d 1294 (6th Cir. 1986) (noting that "it is essential" that the court's "findings and conclusions be stated with sufficient detail to permit effective appellate review").  However, the trial court is "not required to prepare elaborate findings on every possible issue or contention raised at trial," but rather should enter findings that are sufficient to support the court's ultimate conclusions. *Deal*, 369 F.2d at 63-64 (quoting other sources); *see also Lopez v. Current Dir. of Tex. Econ. Dev. Comm'n*, 807 F.2d 430, 434 (5th Cir. 1987) (explaining that Rule 52 "exacts neither punctilious detail nor slavish tracing of the claims issue by issue and witness by witness") (citation omitted).  "[T]he judge need only make brief, definite, pertinent findings and conclusions upon the contested matters; there is no necessity for over-elaboration of detail or particularization of facts."  Fed. R. Civ. P. 52 Notes of Advisory Committee on 1946 Amendments (citations omitted); *see also Lesch v. United States*, 612 F.3d 975, 981 (8th Cir. 2010) (explaining that Rule 52 "does not require explicit detail" but "only requires that the trial court set forth its reasoning with enough clarity that the appellate court may understand the basis of the decision") (internal citations and quotation marks omitted).  Moreover, the trial court's findings of fact "must not be set aside unless clearly erroneous, and the reviewing court must give due regard to the trial court's opportunity to judge the witnesses' credibility."  Fed. R. Civ. P. 52(d); *see also Grover Hill Grain Co. v. Baughman-Oster, Inc.*, 728 F.2d 784, 792-93 (6th

Cir. 1984) (explaining the deferential standard for reviewing the adequacy of the district court's findings in accordance with Rule 52).

Here, the jury concluded that each of EQT's equitable defenses failed.  EQT now urges the Court to reject that advisory verdict and to find instead that Journey's claims against EQT are barred by estoppel, waiver, and laches.  [R. 198-1 at 14-16.]  In contrast, Journey moves the Court to make specific findings of fact and conclusions of law to adopt the advisory jury's verdict, and reject EQT's equitable defenses.  [R. 205 at 9-12.]  Because EQT has not established the necessary elements for any of these defenses, the Court will adopt the findings of the advisory jury and reject EQT's equitable defenses.  In light of Federal Rule 52's mandate explained above, a summary of the Court's findings of fact and legal conclusions concerning EQT's equitable defenses follows. [2]

## B[3]

1.      As noted above, the factual and procedural background laid out in the Court's prior Memorandum Opinions at Docket Entry No. 141 and No. 220 are incorporated by reference.

2.      This Court has already made and explained the following rulings when resolving the parties' motions for summary judgment:  (a)  EQT must convey to Journey all identified oil and gas interests (including the "Further Assurances Wells" and the "Further Assurances

---

[2] Again, because the jury considered EQT's defense that it was a good-faith trespasser in a nonadvisory role, the Court need not enter further findings of fact or conclusions of law on that issue.

[3] The Court notes that Journey has submitted its proposed findings of fact and conclusions of law, and that EQT has not specifically disputed or presented evidence to contradict Journey's proposed factual findings, other than offering general denials and assertions within the context of its other post-trial motions. [*See* R. 210.]  Although EQT disagrees with the Court's ultimate conclusions on these matters, it has not specifically rebutted Journey's proposed findings of fact.  This failure could be considered grounds for deeming Journey's proposed findings admitted.  *See Humphrey v. United States Attorney Gen's. Office,* 279 F. App'x 328, 331 (6th Cir. 2008) (recognizing that a party's lack of response to a motion or argument is grounds for the district court to assume opposition is waived). Nevertheless, despite the apparent lack of dispute as to Journey's proposed findings, the Court has not simply adopted them wholesale, but has still complied with Rule 52's requirement of entering its own findings and explaining its reasoning, both within this Order and within the Order denying EQT's Rule 52 motion.  [*See* R. 220.]

Leases") that lie within the geographic areas outlined on maps attached as Exhibit N to the Purchase and Sale Agreement (PSA), and in accordance with Section 18(a) of the PSA, because EQT is currently in breach of its contractual agreement to convey those properties; (b) the transaction documents of the PSA unambiguously conveyed to Journey all third-party leases described on Exhibit A to the "Master Assignment" of third-party leases to Journey, and leased to Journey all of EQT's fee properties as described on Exhibit A to the "2001 Lease"; (c) EQT's defense of mutual mistake fails as a matter of law, and therefore EQT's counterclaim for reformation of the contractual documents also fails; and (d) Journey was not required to drill a new well on any EQT fee property in order to hold a particular leased tract beyond the 2001 Lease's five-year primary term.  [R. 141.]

3.      In light of the above rulings, the Court determined that several issues were better left for trial – specifically, a) whether any of Journey's claims were barred by EQT's equitable defenses of laches, waiver, and estoppel; and b) whether EQT was a good-faith trespasser.[4]  The resolution of these issues would affect final determination of whether EQT must pay Journey past revenues for trespassing wells for the entire period between July 2001 and the present, and whether Journey was also entitled to prejudgment interest on those revenues.  EQT claimed that the defenses of laches, waiver, and estoppel applied to Journey's trespass claims, but raised only the defense of laches to Journey's claim that it should recover the net revenues from the eight Further Assurances Wells that EQT has been operating since July 1, 2001.

4.      The jury trial in this matter began on September 8, 2014.  Because the defenses of laches, waiver, and estoppel are equitable in nature, the jury acted only in an advisory capacity on those issues.  On September 12, 2014, the jury rendered its verdict rejecting EQT's defense of

---

[4] Journey's trespass claims arose from the fact that EQT drilled (or allowed to be drilled) a number of wells on property that had been conveyed to Journey by the 2001 transactional documents.

good-faith trespass, and rendered an advisory verdict rejecting each of EQT's equitable defenses. After the conclusion of the trial, EQT moved for judgment as a matter of law in its favor and for a new trial.  The Court has already made the following rulings concerning EQT's post-trial motions, which are further explained in the Court's Memorandum Opinion at Docket Entry No. 220: (a) the Court denied EQT's motion for judgment as a matter of law concerning the jury's nonadvisory verdict that EQT is a bad-faith trespasser; (b) the Court denied EQT's motion for a new trial; and (c) the Court upheld the jury's verdict concerning EQT's defense of good-faith trespass.  Because the jury's verdict was only advisory concerning laches, waiver, and estoppel, the following factual findings relate primarily to the Court's determination to adopt the jury's advisory verdict that EQT failed to establish the necessary elements to prove its equitable defenses and to enter judgment in favor of Journey.

5.     Journey's initial claim involved trespass wells that EQT had drilled on property that was assigned to Journey.  During the course of discovery and Journey's internal investigations, Journey eventually discovered eight wells located within the blue boundaries on Exhibit N to the PSA that had not been conveyed to Journey, despite the language in Section 18(a).  These wells are referred to herein as "the Further Assurances wells."  These eight wells were already in existence when the parties entered into their 2001 agreement, and EQT continued to operate them after the July 1, 2001 effective date of the parties' transaction, even though they were located within the blue outlines on Exhibit N.

6.     Section 18(a) of the PSA addressed omitted interests by specifying that if after the date of closing, it was discovered that any interests within the geographic area outlined in blue on the attached map (Exhibit N) had not been conveyed to the buyer, the seller shall convey such interest to the buyer for no additional consideration.  Section 18, however, did not specify that

either party had a duty to search for omitted interests within the blue boundaries, nor did it specify a timeline in which any omitted interests must be discovered. Therefore, Kentucky's fifteen-year statute of limitations for breach of contract applies to those interests by default.

7.     Journey filed suit against EQT in 2012, and then amended its complaint twice in order to account for all eight Further Assurances wells. Thus, Journey did not make a formal demand for the Further Assurances wells until 2013.

8.     At trial, the parties agreed that the Court should inform the jury that the parties had stipulated that for the purpose of any defense related to timing, including laches or limitations, Journey first took legal action on December 15, 2011. Tr. (Sept. 9, 2014) at 135.

9.     Gregory Bird, president of Journey's affiliate Jetta Operating Company, testified at trial about the reasons why Journey did not discover the Further Assurances wells before 2012, and the business context for those reasons. Tr. (Sept. 9, 2014) at 114-46. In doing so, Mr. Bird described Journey's management structure, explained the inherent difficulties in identifying the exact leaseholds where wells were located given the geographical complications of the particular properties at issue, explained that Greg Shockley had not properly "mapped" the properties, stated that the actual decision-makers for Journey did not know that Shockley had failed to map the properties until after he resigned in 2009, and described the detailed research that was done after 2009, and especially after filing the instant lawsuit, to determine what Journey's rights actually were. *Id.* Although Mr. Bird admitted that he wished he had insisted that more detailed maps be prepared sooner or that a more systematic review on Journey's part of the conveyed properties had occurred, *id.* at 144-46, 149-53, the Court finds his explanation of the contextual difficulties in doing so persuasive and credible. The Court further finds that based on the testimony elicited by counsel for both parties, EQT as the operator of the Further Assurances

wells was in the better position to determine that it had omitted to convey those wells to Journey. *Id*. at 143-60.

10.    The testimony EQT elicited from Mr. Bird focused mainly on the length of time that had passed between the 2001 transaction and the lawsuit, Mr. Shockley's role within Journey, and the maps used in the Richardson Barr sales offering; but that testimony did not establish that Journey was required to find the Further Assurances wells, or that EQT took any actions other than continuing to operate those wells even after Journey filed the lawsuit and made a demand for them.  *Id*. at 110-12, 148-60.  EQT also did not present any evidence at trial or in post-trial motions showing that Journey's delay in demanding the Further Assurances wells caused EQT any particular prejudice, injury, or disadvantage.  *Id*.

11.    The Fordson Coal Company third-party lease was listed on Exhibit A of the Master Assignment.  The Fordson Lease consists of 6,333 acres in noncontiguous tracts of land across portions of Letcher, Perry, and Leslie Counties within the Commonwealth of Kentucky. Several portions of the Fordson Lease are located outside of the blue boundaries on Exhibit N to the PSA.  The Court previously found that EQT had conveyed the leases listed on Exhibit A of the Master Assignment to Journey, including the Fordson Lease.  One of Journey's claims in this lawsuit is that EQT trespassed on Journey's property by drilling a number of wells after 2001 on the Fordson Lease.  These wells are referred to herein as "the Trespass Wells."  In response, EQT argued that the defenses of laches, waiver, and estoppel barred Journey's trespass claims.

12.    Greg Shockley was employed by a subsidiary of Journey (called Journey Operating, LLC), and he handled Journey's day-to-day operations in southeastern Kentucky, but he was not actually employed by Journey or by Journey's general partner.  Tr. (Sept. 9, 2014) at

114-16, 148-49, 155-56.  He did not have legal authority to sign or amend contracts, or to bind or commit Journey as a corporation, nor did he make decisions for Journey.  *Id*. at 105, 114-16.

13.     When Journey was preparing to sell some of its property in 2008, Journey discovered that Shockley had not done any of the "mapping" to verify the locations of all the properties conveyed to Journey in 2001 – specifically, that he had not actually mapped out the descriptions of the properties on Exhibit A to the Master Assignment.  *Id*. at 119-24.  Because Shockley never created actual lease maps or otherwise verified the 2001 conveyances, he incorrectly assumed that the Exhibit N map boundaries outlined the full extent of the conveyed properties.  *Id*. at 120-25.

14.     In 2006, Sam Smallwood, who was EQT's regional land director, *id*. at 172, 182, suspected a possible discrepancy within the 2001 transaction documents concerning the Fordson Lease, and he accordingly wrote a note to Michelle Weber, the contract administrator, to ask her about what was conveyed to Journey in 2001.  *Id*. at 183-85.  Ms. Weber wrote back saying that she thought the Fordson Lease had been conveyed to Journey from the surface to the base of the Devonian shale, *id*. at 218-19, and after further conversation with Weber and Lester Zitkus, Smallwood contacted Greg Shockley to ask his opinion.  *Id*. at 183-85.

15.     In the subsequent meeting between Smallwood and Shockley, Smallwood mentioned that there was some question as to what wells had been sold to Journey and that EQT was still operating certain wells on the Letcher County portion of the Fordson Lease.  *Id*. at 186-88.  Shockley orally indicated that he did not think those wells had been conveyed to Journey, but also said he would have to discuss the matter with his boss Brian Baer and get back to Smallwood about it.[5]  *Id.*  Smallwood testified several times that Shockley told him he would

_____

[5] Shockley testified at trial that he thought every property listed on Exhibit A to the conveyance documents was also within the blue lines on Exhibit N, but he also admitted that if he had properly mapped the descriptions on Exhibit

have to discuss it further with Mr. Baer, and thus it would have been unreasonable to assume that Shockley's opinion by itself was indicative of Journey's position or that Shockley had the authority to bind Journey to what he expressed as his own opinion.  *Id*. at 187, 223-25, 232.

16.     Smallwood's testimony also established that he was aware in 2006 of a possible discrepancy concerning the Fordson Lease and that there would need to be a corrective assignment of some kind to establish EQT's rights to it, yet EQT never obtained a corrective assignment, and Smallwood never followed up in writing with Shockley or Baer.  *Id*. at 187-243. (Mr. Bird testified that these discussions between Shockley and Smallwood were never mentioned to him or to Mr. Baer.  *Id*. at 124-25.)  Although Mr. Smallwood testified that Shockley told him EQT should prepare some sort of agreement to correct any error in the PSA, Smallwood admitted that no such agreement was ever executed.  *Id*. at 189.

17.     Shockley also testified that he did not know of any document releasing Journey's rights in any part of the Fordson Lease, and indicated he did not remember any formal follow-up with EQT after his one meeting with Smallwood in August 2006.  Tr. (Sept. 11, 2014) at 129-31. Despite the lack of follow-up to the 2006 conversation with Shockley, EQT drilled multiple trespass wells on the property in question.  Tr. (Sept. 9, 2014) at 230-31.  Upon the evidence presented, no one with the authority to legally bind Journey confirmed to Smallwood that Journey had no claim to the Fordson Lease, nor does this evidence establish that Journey relinquished its rights to the Fordson Lease.

17.     In 2008, Shockley assisted in compiling the materials Journey used in offering several of its Kentucky properties for sale, and the sales brochure contained maps that had similar outlines as the Exhibit N maps because of Shockley's own assumption that those maps

---

A, he would have known that what was actually conveyed was different from what he believed had been conveyed. Tr. (Sept. 11, 2014) at 120-21.

showed the full extent of what Journey owned at that time.  (Journey did not ultimately sell any of those properties.)

18.     EQT received these sales materials in 2008, but counsel for EQT offered no evidence at trial that the sales materials caused EQT to rely on anything within the materials as a basis for drilling additional trespass wells on Journey properties.  Moreover, EQT had already drilled twenty trespass wells by the time the sales materials were compiled in 2008, so the sales materials could not have induced EQT to drill wells before that time.  Tr. (Sept. 9, 2014) at 93.

19.     In March 2009, before he resigned from Journey, Mr. Shockley sent Mr. Smallwood an e-mail concerning some unrelated properties, in which Shockley analogized to the PSA, indicating that both he and Smallwood had found several "errors" and "omissions" in the PSA and that Mr. Shockley previously had believed that the PSA did not intend for Journey to have all the portions of the Fordson Lease located in Letcher County.  Def.'s Trial Ex. 24. However, Shockley's e-mail also indicated that under another interpretation of the PSA, Journey "clearly has a claim" to part of the Fordson acreage in Letcher County, and mentioned that he and Smallwood had discussed the need for some corrective document concerning the supposed error.  *Id*.  As stated above, EQT never ensured that any such corrective document was ever executed before drilling at least twenty of the trespass wells.  Additionally, EQT presented no evidence that it took any action or did not take any action in connection with any of the trespass wells as a result of Shockley's 2009 e-mail or otherwise acted in reliance upon anything in Shockley's 2009 e-mail.

20.     EQT did not present evidence of any actions, conversations, or other representations on the part of Journey before 2006 that could have caused EQT to think that it owned the property where it drilled the trespass wells.  The only evidence EQT presented of any

discussions after 2001 between EQT and Journey about the parties' understandings of the geographic boundaries of the properties conveyed to Journey was the August 2006 meeting between Mr. Shockley and Mr. Smallwood, a brief follow-up conversation that Smallwood was a bit unsure about, *see id*. at 189, and the 2009 e-mail from Mr. Shockley.[6]

21.     EQT did not present any evidence that Journey gave EQT permission to drill the trespass wells or that Journey relinquished its rights to the property on which EQT drilled the trespass wells.  EQT also did not offer any trial testimony or other evidence suggesting that Journey intentionally or knowingly relinquished its right to assert its trespass claims.[7]

21.     After Mr. Shockley resigned in 2009 to work for EQT, Journey's affiliate Jetta Operating Company received the files that had been in Mr. Shockley's West Virginia office, and proceeded to put together information for creating accurate maps of its properties.  While doing so, Journey realized that EQT had drilled wells on Journey's property and brought suit.

22.      As with the Further Assurances Wells, EQT did not offer trial testimony or other evidence showing that Journey's failure to complain about the trespass wells before 2011 caused EQT any injury, prejudice, or disadvantage.

### C

Based on the above factual findings relating to EQT's defenses of laches, waiver, and estoppel, the Court draws the following legal conclusions:

1.     The Court has jurisdiction over this matter under 28 U.S.C. § 1332(a).

---

[6] Mr. Shockley also testified that he did not remember any further conversations with Mr. Smallwood after the August 2006 meeting.  Tr. (Sept. 11, 2014) at 105-06.

[7] Mr. Shockley testified that he never authorized EQT to drill any wells on the Fordson Lease, and that nothing in his communications with EQT personnel should have made them think he authorized such drilling.  Tr. (Sept. 11, 2014) at 131.  Shockley further testified that he never participated in any misrepresentation to Journey and was unaware of Journey ever intentionally giving up any of its rights to any of the property in question.  *Id*. at 132.

2.     Because the parties' transaction documents specified that Kentucky law applies, and because the Court finds that no other state has an interest in this dispute, the Court will apply the law of the Commonwealth of Kentucky to EQT's equitable defenses.

**1**

3.     The equitable defense of laches bars a party's claims "in circumstances where a party engages in unreasonable delay to the prejudice of others rendering it inequitable to allow that party to reverse a previous course of action," but the party "claiming a bar based on delay must also show prejudice." *Plaza Condominium Ass'n, Inc. v. Wellington Corp.*, 920 S.W.2d 51, 54 (Ky. 1996); *see also Fightmaster v. Leffler*, 556 S.W.2d 180, 183 (Ky. Ct. App. 1977) (finding that "[m]ere lapse of time" is not the only element to consider when determining whether a defense of laches applies, but rather the "more important consideration is whether delay in asserting the claim has worked such prejudice or disadvantage to parties adversely interested, or such changed conditions have occurred in the meantime that enforcement of the claim is rendered inequitable").  Thus, a defense of laches requires consideration of whether the delay was unreasonable, and also whether the resulting harm from the delay makes the enforcement of the opposing party's rights unjust.  *See Plaza Condominium Ass'n, Inc.*, 920 S.W.2d at 54 (quoting *Denison v. McCann*, 197 S.W.2d 248, 249 (Ky. 1946)).

4.     Laches is an affirmative defense on which EQT bore the burden of proof.  *See Plaza Condominium Ass'n, Inc.*, 920 S.W.2d at 54.

5.     With regard to the Further Assurances wells, EQT has not shown that any statute of limitations applies other than Kentucky's general fifteen-year statute of limitations for breach of contract.  Journey brought suit against EQT within that fifteen-year time frame.

6.      With regard to either the Further Assurances wells or any of the Trespass wells, EQT did not present evidence demonstrating that Journey's delay in asserting its rights was unreasonable, given the circumstances outlined by Mr. Bird's testimony of how and why Journey discovered the trespasses, and particularly in light of the fact that EQT was the party who drafted the conveyance documents including the Exhibit N maps.

7.      Even if the delay were somehow unreasonable, however, EQT also has failed to establish the necessary prejudice element.  *See Fightmaster*, 556 S.W.2d at 183.  EQT presented no evidence before, during, or after trial showing that EQT suffered prejudice by Journey's delay in asserting any of its rights – on the contrary, EQT has been benefiting from the revenues from wells it did not own for nearly a decade.  Especially with regard to the Further Assurances wells, EQT has continued to operate them and receive proceeds from them since 2001, but EQT has not demonstrated in what way that situation has harmed EQT.

8.      Despite EQT's contention that it would be "inequitable" to award Journey revenues from the trespass wells when EQT had maintained and operated the wells for years [R. 198-1 at 16], because EQT was the drafter of the contractual documents and the seller of the properties, EQT was logically the party in the better position to determine what property it actually conveyed to Journey.[8]

9.      Moreover, with regard to the Further Assurances wells, even EQT has conceded that at the very least the property *within* the blue boundaries on Exhibit N was conveyed to Journey.  In the words of EQT's counsel, "there [have] never been any disputes" nor has there ever been "any doubt" that the property within the Exhibit N outlines of the Further Assurances area was conveyed to Journey.  Tr. (Sept. 9, 204) at 158.  Yet even though Journey requested the

---

[8] The Court notes that it directly disagrees with EQT's unfounded assertion that "Journey was in an equal or better position to determine" that EQT did not actually own the trespass wells.  [*See* R. 198-1 at 16.]

Further Assurances wells and leases in 2013, EQT did not convey the Further Assurances Wells or leases, and to the Court's knowledge, still has not conveyed them.  If the parties agree that there is no dispute that the property within the blue boundaries was conveyed to Journey, it does not appear that EQT would be so unduly prejudiced by conveying those wells to Journey that it would be inequitable to enforce a conveyance that EQT concedes.

10.     Finally, as Journey points out, the damages to which the parties have stipulated only award Journey the *net* revenues in order to compensate EQT for the operating costs – accordingly, EQT has not established the prejudice necessary to assert a defense of laches.  [*See* R. 205 at 12.]

**2**

11.     The defense of estoppel requires the party claiming estoppel to prove that the opposing party intentionally said or did something that amounts to false representation or concealment of material facts, while knowing the true facts and while intending or expecting that the other party will rely on the misrepresentation or concealment to its detriment.  *Howard v. Motorists Mut. Ins. Co*., 955 S.W.2d 525, 527 (Ky. 1997); *Edmondson v. Pennsylvania Nat'l Mut. Casualty Ins. Co*., 781 S.W.2d 753, 755-56 (Ky. 1989); *Smith v. Howard,* 407 S.W.2d 139, 143 (Ky.1966).  The conduct of the estopped party can include both language and silence. *Howard*, 955 S.W.2d at 527.  The party claiming estoppel must also show that it did not know the true facts, that the misrepresentation or concealment caused it to in fact rely upon the other party's conduct, and that such reliance caused its position to change prejudicially.  *Weinberg*, 338 S.W.3d at 314.

12.     Estoppel is an affirmative defense for which EQT bore the burden of proof.  The Court finds that EQT has failed to establish the necessary elements for estoppel.

13.     EQT primarily contends that it relied on Journey's misrepresentations when drilling the Trespass Wells, but EQT's primary support for this defense focuses on alleged communications between Greg Shockley, Mr. Smallwood, and Brian Baer.  [R. 198-1 at 14.]  According to EQT, Journey knew in 2006 that EQT intended to drill on portions of the Fordson Lease located outside the blue boundaries, and that Shockley verbally agreed with Smallwood's belief that EQT owned those properties.  [*Id*.]  Shockley then sent a fax to Mr. Baer in which Shockley informed him of EQT's drilling intentions.  EQT further claims that it relied upon Shockley's suggestion that EQT draft a "letter of agreement to correct the PSA" and also upon "Journey's continued silence as EQT proceeded with its drilling plans."  [*Id*.]  None of these allegations sufficiently establish the elements of estoppel described above.  Upon this version of the facts, it would appear that Journey was also mistaken about what property it owned, and if so, estoppel could not apply because Journey would not have the requisite knowledge or intent to misrepresent or conceal what property it owned.  If anything, the testimony presented at trial indicated that Journey may not have fully known the extent of its property rights, and if so, Journey could not have intentionally misrepresented anything about those rights to EQT.

14.     Additionally, since EQT drafted the contract at issue, it would be unreasonable for EQT to rely solely on Journey's interpretation of it, especially when, if anything, Shockley's suggestion about drafting a letter to correct a potential mistake in the PSA should have alerted EQT to the possibility of just that – a mistake in the contract's drafting or in the parties' interpretation of it.[9]  If anything, the conversation between Shockley and Smallwood should have indicated that there was some confusion as to what EQT owned, and should have made EQT

---

[9] There is also no indication that EQT ever drafted such a letter or took other steps to correct the PSA.

even more cautious about drilling on the property at issue before taking affirmative steps to clear up that confusion.

15.    Moreover, as the evidence at trial revealed, Mr. Shockley had no authority to bind Journey to anything and made clear to Smallwood that he would have to clear any decision with someone higher up such as Mr. Baer.  Tr. (Sept. 9, 2014 at 115-16); Tr. (Sept. 11, 2014) at 106, 127-29.  Thus, equating Shockley's comments or personal beliefs with the understanding or intention of Journey as a corporation is misguided at best.  Put simply, nothing Shockley said or did could establish Journey's intent or knowledge for purposes of estoppel.  Although Smallwood testified that he "believed" that Shockley could make decisions for Journey's operations in Kentucky, a few minutes later, Smallwood also testified that Shockley told him he would have to confirm with his boss Brian Baer and get back to Smallwood concerning Smallwood's question about what wells had been transferred.[10]  Tr. (Sept. 9, 2014) at 186-87. Notably, Smallwood did not testify that Shockley represented to him that he spoke for Journey.[11] It would certainly have been unreasonable for EQT to rely only on one conversation with Shockley (who did not claim to speak for Journey) as the primary justification for drilling twenty trespass wells.

---

[10] Even had Shockley possessed the authority Smallwood apparently thought he had, Smallwood also testified that although he met with Shockley for the purpose of obtaining "a corrective assignment or a corrective document that would indicate that Journey either disclaimed or acknowledged it had no rights to the Fordson Lease in Letcher County," Smallwood admitted at trial that such an agreement was never executed and that he did not follow up with Shockley to obtain such an agreement.  Tr. (Sept. 9, 2014) at 213-14.  If that were the purpose of the meeting and if Smallwood never obtained it, there is not much basis for arguing that this meeting proves Journey knowingly gave up a right or knowingly misled Smallwood, nor is there a basis for EQT's argument that this meeting demonstrates Journey misrepresented anything that EQT could reasonably rely upon.

[11] Smallwood also testified that follow-up conversations indicated the possibility of a mistake and a need for a corrective document, but admitted that no such agreement was ever executed.  Tr. (Sept. 9, 2014) at 189.

16.     Finally, none of these arguments relate to trespasses that occurred in other places besides the Letcher County Fordson tract, and therefore EQT cannot rely on them to establish estoppel in relation to Journey's other trespass claims.

17.     The only additional support for its estoppel defense that EQT points to is its argument that EQT's belief about what it owned "was reinforced" by Journey's presentation concerning the Richardson Barr sales materials in 2008.  [R. 198-1 at 14-15.]  EQT claims that it relied on Journey's representations as to what land it owned in the Offering Memorandum, and that based on that Memorandum, EQT also believed Journey at least "had no objection" to EQT's continued development of all lands outside the blue boundaries.  [*Id*. at 15.]  However, EQT presented no evidence that EQT actually relied on anything in the Richardson Barr sales materials.  Even if it had, as Journey aptly points out, EQT committed many trespasses before the 2008 sales offering, and thus the sales materials could not have justified any of the pre-2008 trespasses.  Moreover, to the Court's knowledge, EQT has presented no evidence before, during, or after trial demonstrating that anything about the Richardson Barr sales materials indicates Journey's intentional misrepresentation or concealment of facts for the purpose of causing EQT to detrimentally rely on such misrepresentation.  Thus, even if Journey's representations about what property it owned in 2008 were incorrect, there has been no evidence establishing that the error was intentional, or that EQT's reliance on it was detrimental to EQT.

18.     Concerning estoppel, EQT also failed to present evidence about how EQT's position changed detrimentally as a result of its alleged reliance on Journey's conduct or concealment.  Since EQT's trespass resulted in EQT using and receiving proceeds from Journey's property for several years, it is particularly difficult to see how EQT's position has changed to its detriment.  Even if Journey knew that it owned the land on which EQT intended to

drill, yet kept silent about its knowledge, there is no indication that EQT detrimentally relied on such concealment to its detriment because it was Journey whose position was detrimentally affected by EQT's trespass rather than EQT's.

19.     In short, EQT presented no testimony at trial that Journey made any misrepresentations to EQT or concealed any material facts from EQT.  EQT also presented no credible evidence that it relied on anything Journey said or did that could justify its trespass. Thus, EQT failed to prove the elements of knowledge, intent, or detrimental reliance required for a defense of estoppel.

**3**

20.     Waiver is also an affirmative defense for which EQT bore the burden of proof.

21.     Waiver consists of "a voluntary and intentional surrender or relinquishment of a known right," or an intentional decision "to forego an advantage."  *Barker v. Stearns Coal & Lumber Co.*, 163 S.W.2d 466, 470 (Ky. 1942); *see also Weinberg v. Gharai*, 338 S.W.3d 307, 314 (Ky. Ct. App. 2011) (quoting *Barker*, 163 S.W.2d at 470).  Although waiver can be inferred from a failure to insist upon recognition of one's rights, the right still must be known to the party who possesses it for the defense of waiver to apply.  *Id.*

22.     Although EQT contends that Journey waived its rights to portions of the Fordson Lease, the only support EQT presents for this argument is the 2006 conversation between Shockley and Smallwood and the 2008 Richardson Barr sales materials.  [*See* R. 210 at 5-6.]  As already discussed above, however, Shockley's mistaken assumptions do not prove that *Journey* relinquished any rights.  Even if Shockley were mistaken and even if he were willing to arrange some sort of corrective document, EQT never followed up to obtain any contractual amendment or other written agreement in which Journey relinquished its rights to the Fordson Lease.

23.     As for the sales materials, EQT presented no evidence showing how those materials indicate that Journey relinquished its rights to its property.  Again, if anything, the sales materials indicate Journey may have been mistaken about what it owned, and if so, could not have intentionally given up any *known* rights.  The 2008 sales offering also could not have acted as a waiver before 2008, and thus does not justify pre-2008 trespasses.

24.     In sum, EQT presented no testimony at trial that Journey intentionally gave up any of its rights.  While EQT's assertions, and some evidence at trial, may indicate that some individuals involved may have been mistaken as to what Journey actually owned, EQT has yet to present evidence establishing that Journey intentionally gave up a *known* right.[12]  More than a mistake is necessary for waiver to apply.  If anything, the testimony at trial indicated that Journey may not have even known about its rights to the Fordson Lease, and if so, Journey could not have intentionally relinquished those rights.

25.     Thus, EQT failed to prove the knowledge and intent elements required for waiver.

26.      Moreover, EQT's defenses of both waiver and estoppel depend on establishing *Journey's* knowledge and intent, not Mr. Shockley's, and not EQT's.  For instance, Mr. Bird (president of Jetta Operating Company that had an ownership in Journey) testified at trial that Shockley had no legal authority to bind or commit Journey to any legal positions or to sign or amend any contracts, nor was he the decision-maker for Journey.  Tr. (Sept. 9, 2014) at 105, 115-16.  According to Mr. Bird, who along with Mr. Baer actually made decisions for Journey, *id*. at 116, after Shockley resigned in 2009, it was discovered that Shockley never "mapped" or

---

[12] The Court's comments on the fact that some evidence implies Journey employees were mistaken as to what Journey owned are not intended to contradict the Court's previous finding that EQT failed to establish its claim of mutual mistake when the Court denied EQT's motion for summary judgment.  [*See* R. 141 at 36.]  That finding still stands because the Court did not determine that no employee of either company was mistaken as to the proper interpretation of the contract; rather, the Court specifically found that EQT did not meet or even discuss the legal standard for obtaining reformation of a contract based on mutual mistake.  [*See id*.]

properly verified the boundaries of the properties at issue but just kept using the Exhibit N maps without creating actual lease maps. *Id*. at 105-06, 119-20. Bird testified that the blue boundaries were only a "general representation" that was "easy and convenient" for Shockley to use because he lacked "time or budget or opportunity" to create a proper map before the attempted 2008 sale. *Id*. at 123. Bird testified that once it was clear that Shockley had failed to properly verify maps, a group of people were commissioned to go through the files and start verifying the lease properties. *Id*. Bird also testified that he was unaware of any discussions between Shockley and EQT representatives concerning Journey's releasing rights to any property it owned in the Fordson Lease. *Id*. at 125. According to Mr. Bird, it was only in 2009 after Shockley resigned and Journey employees began comparing the lease descriptions to the generalized map boundaries that Journey discovered EQT had committed multiple trespasses by drilling on land Journey owned. *Id*. at 125-27. The Court finds Mr. Bird's testimony highly credible compared to Mr. Shockley's testimony, and based on that testimony, neither estoppel nor waiver could apply to bar Journey's claims in this matter.

27. The jury rejected EQT's defenses to laches, waiver, and estoppel concerning Journey's trespass claims, and also rejected EQT's defense of laches concerning Journey's Further Assurances claim. Although the jury acted in an advisory capacity concerning these defenses, the Court has also considered the evidence and concludes that, for all the reasons given above and those explained in prior opinions, EQT failed to prove by a preponderance of the evidence its laches defense, waiver defense, or estoppel defense concerning any of Journey's claims. In particular, EQT fails to demonstrate the requisite intent or knowledge on the part of Journey in order for estoppel or waiver to apply, and also fails to sufficiently establish the

necessary prejudice element in order to assert a defense of laches.  Accordingly, judgment will be entered in favor of Journey.

28.     To the extent that any of the Court's findings of fact are properly conclusions of law, and vice versa, the Court intends that they be so considered.

## II

Journey's Motion for Entry of Judgment also renews its request for prejudgment interest on its stipulated damages, and includes a request that the damages calculation be compounded. [R. 205 at 17-26.]  For the reasons explained below, that request will be GRANTED IN PART and DENIED IN PART.

## A

In diversity cases, the law of the forum state governs awards of prejudgment interest. *Poundstone v. Patriot Coal Co., Ltd.*, 485 F.3d 891, 901 (6th Cir. 2007).  In Kentucky, a party is entitled to prejudgment interest as a matter of right if the claim is liquidated, but if the claim is unliquidated, any award of prejudgment interest is within the discretion of the trial court.  *Id.*; *Nucor Corp. v. Gen. Elec. Co.*, 812 S.W.2d 136, 141-44 (Ky. 1991).  A damages claim is liquidated if it is "of such a nature that the amount is capable of ascertainment by mere computation, can be established with reasonable certainty, can be ascertained in accordance with fixed rules of evidence and known standards of value, or can be determined by reference to well-established market values."  *3D Enterprises Contracting Corp. v. Louisville and Jefferson Cty. Metropolitan Sewer Dist.*, 174 S.W.3d 440, 450 (Ky. 2005).  The Kentucky Supreme Court has listed examples of liquidated damages such as "a bill or note past due, an amount due on an open account, or an unpaid fixed contract price."  *Nucor Corp.*, 812 S.W.2d at 141.  In contrast,

unliquidated damages "have not been determined or calculated, . . . not yet reduced to a certainty in respect to amount." *Id*. (quoting *Black's Law Dictionary* 1537 (6th ed. 1990)).

Here, Journey makes a valid point that it believes it could argue that its claim is liquidated because calculating the profits from operating oil and gas wells "is a reasonably straightforward calculation" and because the parties executed a stipulation as to the damages in this case. [R. 205 at 17-18, n. 48.]  However, the parties' damages stipulation primarily focused on the methodology of calculating damages rather than on a definite total amount.  Moreover, the stipulation was executed before the Court resolved the underlying dispute involving contract interpretation and property ownership, and thus the total amount of damages was disputed by the parties and was not resolved until the Court's recent decision on EQT's post-trial motions.  Thus, the total value of Journey's underlying trespass claim and breach of contract claim was not "agreed upon by the parties [nor] fixed by operation of law," and therefore the damages are unliquidated.  *See Ford Contracting, Inc. v. Ky. Transp. Cabinet*, 429 S.W.3d 397, 414 (Ky. App. 2014) (quoting *Nucor Corp*., 812 S.W.2d at 141 as support for its finding that the damages claim was unliquidated when the parties vigorously disputed the total amount owed under a contract and the exact amount "could not have been predicted with any amount of certainty" at the time of the breach).  Given the nature of the parties' dispute, and that Journey essentially concedes it will not argue that its damages are liquidated, the Court will treat the damages claim as unliquidated for purposes of determining whether to award prejudgment interest.

Because Journey's claim is unliquidated, "[t]he determination as to whether or not to award prejudgment interest is based upon the foundation of equity and justice," and is a matter within the Court's discretion.  *Church and Mullins Corp. v. Bethlehem Minerals Co*., 887 S.W.2d 321, 325 (Ky. 1992); *see also Univ. of Louisville v. RAM Eng'g & Constr., Inc*., 199

S.W.3d 746, 748 (Ky. App. 2005) ("When the amount [of damages] is 'unliquidated,' the amount of prejudgment interest, if any, is a matter for the trial court weighing the equitable considerations.").  In exercising its discretion, the court may "consider a variety of relevant factors."  *Ky. Commercial Mobile Radio Service Emergency Telecommunications, Bd. v. TracFone Wireless, Inc*., 712 F.3d 905, 917 (6th Cir. 2013).  The trial court may consider 'all the circumstances, including any deficiencies in the performance of the injured party and any unreasonableness in the demands made by him.'"  *Ford Contracting, Inc*., 429 S.W.3d at 415 (quoting *Nucor Corp*., 812 S.W.2d at 144).  In doing so, "Kentucky courts rarely award prejudgment interest on unliquidated claims on equitable grounds," but when such interest is awarded, "allegations of bad faith are often involved."  *Id*. (citing *Meridian Citizens Mut. Ins. Co. v. Horton*, 2010 WL 1253084, at *9 (W.D.Ky. Mar. 25, 2010)).

### 1

With regard to the Further Assurances interests, Journey argues that it should receive prejudgment interest on the damages because EQT has been benefiting from the net revenues on the Further Assurances wells ever since July 2001.  [R. 205 at 19-20.]  The Court has previously found that EQT was contractually obligated to convey these interests to Journey, and EQT has conceded that its intent at the time of the contract was in fact to convey those interests.  "Damages for breach of a contract are normally that sum which would put an injured party into the same position it would have been in had the contract been performed."  *RAM Eng'g & Constr., Inc*., 199 S.W.3d at 748 (citing *Hogan v. Long*, 922 S.W.2d 368, 371 (Ky. 1995)).  In weighing the equitable considerations of awarding prejudgment interest on a breach of contract claim, "equity and justice demand that one who uses money or property of another . . . should at least pay interest for its use in the absence of some agreement to the contrary. . . .   This principle

applies whether or not the amount owed to another is liquidated or unliquidated." *Id.* (quoting *Curtis v. Campbell*, 336 S.W.2d 355, 361 (Ky. 1960) (internal quotation marks omitted)). Moreover, the reason for charging interest is "not only because of the value to the one who uses money, but also as compensation to the one who has been deprived of the use of money. . . . [Although interest] is denied when its exaction would be inequitable . . . the tendency of the courts is to charge and allow interest in accordance with the principles of equity, to accomplish justice in each particular case." *Nucor Corp.*, 812 S.W.2d at 143 (quoting 47 C.J.S., "Interest and Usury," § 6 (1982)).

In considering the equitable circumstances of this case, had the Further Assurances interests been conveyed to Journey in 2001, as required under the parties' contract, Journey would have been receiving the net revenues from the Further Assurances wells since that time.[13] To put Journey back into the position it would have enjoyed had the parties' 2001 agreement been performed, EQT should pay Journey all net revenues on the Further Assurances wells that EQT has been receiving since 2001.  Moreover, EQT has consistently maintained throughout this litigation that its intent was to convey *all* the interests *within* the blue boundaries on Exhibit N, and EQT does not dispute that the wells within those boundaries that EQT still possesses should have been conveyed to Journey in 2001.  Because EQT has been enjoying the use of Journey's property and the profits from it since 2001 – profits and likely interest that Journey could have earned but for EQT's failure to convey the wells – it is equitable to require EQT to pay Journey interest for the use of its money and resources that EQT has had for over a decade, and which EQT concedes it intended to convey to Journey.

---

[13] This is particularly true with respect to the Further Assurances wells because they had already been drilled at the time of the contract, and thus Journey presumably could have been receiving profits from them since 2001.

Moreover, despite EQT's repeated insistence that it intended to convey all the interests within the blue lines, and despite EQT's insistence that any trespasses it committed were innocent mistakes, EQT did not transfer the Further Assurances interests to Journey even when Journey amended its complaint to add the Further Assurances wells or when Journey sent EQT a formal demand letter for them.  Journey points out that EQT's failure to convey these interests amounts to a breach of contract, and that "every month that EQT received and kept net revenues from the Further Assurances wells was a month that it breached the PSA."  [*Id*. at 20.]  The Court finds this argument persuasive.  Journey made its demand for the Further Assurances wells within the statute of limitations, and although EQT has never disputed that these wells should have been conveyed to Journey in 2001, EQT still has not transferred them to Journey or paid Journey any of the revenues.

EQT's only basis for arguing that Journey should not receive prejudgment interest on the Further Assurances wells is that Journey delayed in asserting its claims to those wells and that if Journey had asserted its claim earlier, "no interest would have accrued."[14]  [R. 210 at 12.]  The plaintiff's delay in bringing suit is a valid consideration in balancing the equities, and is certainly a consideration given the circumstances of this case.  *See, e.g., Nucor Corp*., 812 S.W.2d at 144 (noting that the trial court may consider "deficiencies in the performance of the injured party"); *Ford Contracting, Inc*., 429 S.W.3d at 415 (affirming the denial of prejudgment interest to plaintiff when the delay in making payment on plaintiff's claim was the result of plaintiff's clearly unreasonable damages claim).  However, with regard to the Further Assurances wells and leases, Journey's delay is outweighed by other circumstances of this case.  Specifically, EQT was the party who drafted the contract.  EQT was the party that drew the boundaries on the

---

[14] The Court notes that one main reason for EQT's position that prejudgment interest should not be awarded is that the full extent of the parties' liability has not finally been determined until resolution of the post-trial motions.  [R. 210 at 11-12.]  This point is now moot given the Court's resolution of the parties' post-trial motions.

maps, attached and labeled Exhibit N as it did, and drafted the Further Assurances clause in the PSA.  EQT was the party who possessed the Further Assurances wells before the 2001 conveyance and who also continued to operate the wells afterward.  Journey asserts, and EQT has never disputed, that EQT was the party who possessed all the files related to the wells.  Thus, as the Court has previously explained, EQT was the party in the better position to ascertain which interests were conveyed, especially those within the Exhibit N map boundaries, yet EQT did not take steps to ensure that it fulfilled the obligations it wrote into the contract. Additionally, in 2009, EQT drilled a trespass well on land that was inside the blue boundaries, and relied on a title opinion from 1990 while doing so, which would clearly have been deficient if EQT's intent from the beginning was to transfer all the land within the blue boundaries to Journey.  *See* Tr. (Sep. 10, 2014) at 20-22 (Mr. Smallwood admitting this well would have been on Journey's property even under EQT's interpretation of the contract).  Finally, EQT could have at least taken steps to minimize the amount of potential interest due by simply transferring the wells to Journey as soon as Journey demanded them.  EQT, however, is still delaying by not transferring the wells or paying Journey any revenues, and should not now complain about *Journey's* delay.  Accordingly, the Court will award Journey prejudgment interest on the Further Assurances interests for the entire time period from July 1, 2001 to the present.

**2**

Journey also contends that it should receive prejudgment interest on the damages it sustained as a result of EQT's bad-faith trespass.  [R. 205 at 22.]  Because the Court has already ruled that it will uphold the jury's verdict that EQT acted in bad faith concerning its drilling of the trespass wells, and in authorizing the drilling of the DPI wells, it is unnecessary to recite in detail the reasons for that conclusion. [*See* R. 220.]  However, the Court finds that several of

27

those same reasons also support the Court's determination that EQT should pay Journey prejudgment interest on the damages related to the trespass wells.

For example, although Mr. Smallwood testified at trial that EQT always obtained title opinions before drilling wells to ensure it had the right to drill, Tr. (Sep. 9, 2014) at 205, Mr. Smallwood's testimony also revealed that the title opinion EQT relied upon before drilling the KRCC wells was done in 1961, *id*. at 245-47, and the title opinion relied upon when drilling a trespass well on the W.G. Cornett tract was dated 1985.  Tr. (Sep. 10, 2014) at 18-20.  Moreover, the evidence presented revealed that EQT filed an amendment of the Fordson Lease in two counties while knowing, or at least suspecting, that the amendment falsely represented that EQT owned all the leasehold rights in Letcher County, and that EQT then purportedly relied upon title opinions premised on that false amendment before drilling a number of the trespass wells.  Tr. (Sep. 9, 2014) 236-44; Pl.'s Exs. 89, 173.  Mr. Smallwood also admitted that when EQT began drilling or requesting title opinions on the Fordson Lease in the summer of 2006, there was at least "a question mark" as to whether EQT truly owned the part of the Fordson Lease in Letcher County, and that Smallwood knew a corrective assignment was likely necessary concerning the Fordson Lease; yet despite that knowledge, EQT drilled a number of trespass wells in 2006 and in 2007 without acquiring any corrective assignment, and while apparently relying on a title opinion for part of the lease that EQT knew would not reveal a recorded instrument showing the lease had been assigned to Journey.  Tr. (Sep. 9, 2014) at 225-32.

As stated above, although Kentucky courts do not frequently award prejudgment interest for unliquidated claims, when such interest is awarded, it is usually within the context of a party acting in bad faith.  *TracFone Wireless, Inc*., 712 F.3d at 917 (citation omitted).  Here, the Court's determination that evidence supports the jury's verdict that EQT acted in bad faith,

together with the factual findings listed previously in this Opinion and the examples of EQT's behavior mentioned above, all weigh in favor of granting Journey prejudgment interest when considering the totality of the circumstances.  The Kentucky Supreme Court has upheld awards of prejudgment interest in such situations.  *See Church and Mullins Corp*., 887 S.W.2d at 325 ("Given that the trial court determined that [Defendant] was a willful trespasser, and given the length of time for which the trespass continued, we cannot say the trial court abused its discretion in awarding prejudgment interest.").[15]

EQT makes one argument, however, in opposition to this award that gives the Court some pause and will be further discussed below.  EQT points out that part of Journey's explanation for why it did not discover EQT's trespasses sooner is that Journey was focused on drilling where there was already existing infrastructure.  [*See* R. 205 at 13 (citing Tr. (Sep. 9, 2014) at 106-07).]  Based on this, EQT argues that transferring the trespass wells to Journey is already giving Journey more than it would have had apart from EQT's trespass because the wells have already been drilled, and that to additionally award Journey prejudgment interest would give Journey an unfair "windfall."  [R. 210 at 12-13.]  According to EQT, awarding Journey prejudgment interest would encourage similar parties "to sit on their claims for decades in order to reap the benefits of an award of prejudgment interest."  [*Id*.]  First, if the matter of the trespass wells were only a breach of contract, this concern of EQT's might weigh more heavily because giving Journey even the wells, let alone prejudgment interest, would go beyond putting Journey back into the position it would have been in but for a breach of contract.  However, in addition to breaching the contract, EQT also committed the tort of trespass by drilling wells on property it did not own.  When determining damages resulting from bad-faith trespass, part of the proper

---

[15] The Court finds EQT's attempt to distinguish this case from the circumstances of its own situation unsuccessful.

focus in such situations is on punishing the trespasser rather than merely compensating the landowner. *See Moore v. Jet Stream Investments, Ltd*., 261 S.W.3d 412, 428 (Tex. App. 2008).

Second, because awarding prejudgment interest on unliquidated claims is a matter within the court's discretion and depends on the equities of the particular circumstances in each case, the Court does not believe that awarding Journey prejudgment interest under these circumstances would necessarily encourage other landowners to delay in asserting their rights in the hopes of collecting larger damages from those who trespass on their property. Moreover, as stated previously, as the drafter of the contract and the seller of the property, EQT was in the better position to know what it sold, and thus EQT's delay in ascertaining what property it conveyed is perhaps equally culpable and at least cancels out any repercussions from Journey's delay. Again, EQT could have minimized the amount of potential prejudgment interest at any time by correctly ascertaining what it owned both before and after drilling wells, especially when EQT knew that for many of those wells there was a question as to the extent of Journey's interest in the property where the wells were drilled. Accordingly, Journey's request for prejudgment interest on its damages will be GRANTED.

**B**

Journey's motion for judgment also includes a request that any prejudgment interest awarded be compounded rather than simple. [R. 205 at 24-27.] Whether damages are liquidated or unliquidated, a district court's decision whether to award simple or compound prejudgment interest on the damages "is within its discretion under Kentucky law." *Travelers Property Cas. Co. of Am. v. Hillerich & Bradsby Co., Inc*., 598 F.3d 257, 265 (6th Cir. 2010). Although "pre-judgment interest has traditionally been simple interest, case law does not indicate that it is required to be so." *Reliable Mech., Inc. v. Naylor Indus. Servs*., 125 S.W.3d 856, 858

(Ky. Ct. App. 2003).  Rather, "compound interest may be awarded to accomplish justice in accordance with the principles of equity and the circumstances of each particular case." *Leasure v. Coleman American Companies, Inc.*, 2008 WL 2065235, at *3 (Ky. Ct. App. May 16, 2008) (unpublished decision) (citing *Reliable Mech.*, 125 S.W.3d at 858).

The Kentucky Court of Appeals explained its reasoning for allowing compound interest in *Reliable Mechanical* because the defendant had deprived the plaintiff "of the use of the money rightfully due and owed to it for nearly eight (8) years" when the defendant arguably "would have been capable of earning compound interest on its money during this lengthy time period." *Reliable Mech.*, 125 S.W.3d at 858.  The court in that case went on to explain that the award of compound prejudgment interest there "[did] not constitute a punitive reprisal as to Reliable. Rather, it is an equitable means of recognizing the economic reality that Reliable has enjoyed a long opportunity to earn interest on the money that it wrongfully withheld from Naylor." *Id.* Awarding compound interest can be a means of "adjust[ing]" the inequitable result of providing the prevailing party with money that it might have earned itself but for the wrongful actions of the opposing party. *Id.*; *see also Prima Int'l Trading v. Wyant*, 2009 WL 722609, at *3 (E.D.Ky. Mar. 17, 2009) (quoting the reasoning in *Reliable Mech.*, 125 S.W.3d at 858, as basis for awarding compound prejudgment interest).

Here, with regard to the Further Assurances wells, had they been conveyed to Journey as contractually agreed upon, Journey could have been earning the revenues from those wells from 2001 until now, and arguably enjoying interest on those profits.  As the seller and possessor of those wells and as the drafter of the contract, EQT could have stopped the running of the interest at any point by performing its contractual duty, and especially could have minimized potential interest by conveying the Further Assurances wells or net revenues from them to Journey as soon

31

as Journey made a formal demand for them.  Moreover, EQT has provided no legal reasoning for finding that the prejudgment interest should not be compounded.  [*See* R. 210 at 14.]  Thus, the Court believes that the prejudgment interest for the Further Assurances wells should be compounded as a means of restoring the equities of the situation and putting Journey in the position where it would have been if not for EQT's breach of the contract.  *See, e.g., Groupwell Int'l (HK) Ltd. v. Gourmet Express, LLC*, 2014 WL 2618601, at *20 (W.D.Ky. June 12, 2014) (awarding compound interest and noting that "[a]t any time during the pendency of this litigation [Defendant] could have stopped the running of this interest by paying [Plaintiff] what it admittedly owed.  Instead, it kept the money and used it to fund its own operations.").

With regard to Journey's trespass claims, however, the Court does not believe the equities merit compounding the interest.  Although Journey's delay in asserting its trespass claims was not by itself sufficient grounds for EQT's laches defense, nor did it excuse EQT's bad faith trespass, the Court believes that Journey's delay is still a factor to consider in weighing the equities involved.  For the property where EQT drilled the trespassing wells, Journey will now receive wells it did not drill and prejudgment interest on the damages for trespass.  Had Journey discovered and asserted its rights earlier, that interest would be less.  Unlike many of the cases in which courts grant compound prejudgment interest, Journey's trespass claim does not involve a set amount of money that EQT was using.  EQT expended its own resources in drilling wells on properties where Journey apparently was not interested in drilling previously because there was no existing infrastructure.  Although this does not excuse EQT's trespass, and although the Court believes prejudgment interest is warranted for the reasons stated above, the Court is not convinced that compounding that interest with regard to the trespass claim is necessary.

Finally, because the parties do not have a contractually agreed upon rate for prejudgment interest, the appropriate rate is governed by KRS § 360.010, which provides that the "legal rate of interest is eight (8%) percent per annum."  KRS § 360.010(1); *Reliable Mech.*, 125 S.W.3d at 857.  Accordingly, Journey will be awarded prejudgment interest on the Further Assurances damages at 8% compounded annually from July 1, 2001 until the present, and will be awarded prejudgment interest on the trespass damages at 8% *simple* from December 15, 2006 until December 15, 2011.[16]

### III

In conclusion, the Court notes that the primary basis for its decision in this matter is that EQT failed to meet the legal standards required for obtaining success on its claims and defenses. The Court's rulings here do not necessarily mean that Journey was completely blameless in every way or that EQT was completely malicious in all its actions.  The Court must apply the law to the evidence presented, keeping in mind the parties' respective burdens.  For most of the issues presented, EQT had the burden of establishing certain legal elements, and based on the evidence presented that burden was not met.

The Court intends to enter final judgment under Federal Rule 58 as soon as possible, but the final details concerning the exact amount of damages and the transfer of the Trespass Wells and any legitimate operating rights to Journey may require the parties to provide further information to the Court.  It is the Court's belief that entering the present Opinion explaining the Court's final rulings and reasoning may assist the parties in fully resolving the logistical details of transferring the property to Journey in a manner that comports with the parties' contractual agreement.  Many of these details are best negotiated by the actual parties rather than the Court.

---

[16] Because of the statute of limitations for its trespass claims, Journey's damages only reach back five years from December 15, 2011.

However, because Journey has requested a hearing [R. 219] to discuss various events that have occurred since the trial and that may affect the final judgment, and because the Court is aware that there are some outstanding issues connected to the motions that are still pending which require the Court's resolution [R. 199, R. 219], the Court will set a status conference by subsequent order, after which the Court intends to enter its final judgment as soon as practicable.

Accordingly, the Court being sufficiently advised, it is hereby **ORDERED** as follows:

1.      Journey's Motion for Judgment [**R. 204**] is **GRANTED IN PART and DENIED IN PART**;

2.      EQT's Motion for New Trial and For Judgment as a Matter of Law[17] [**R. 198**] is **DENIED**;

3.      Judgment will be entered in favor of Journey, and Journey will be awarded the amount of damages stipulated to by the parties concerning the Further Assurances Wells and the Trespass Wells;

4.      Journey will be awarded prejudgment interest on the damages related to the Further Assurances Wells at 8% compounded annually from July 1, 2001 until the present, and will be awarded prejudgment interest on the trespass damages at 8% **simple** from December 15, 2006 until December 15, 2011; and

5.      This matter is continued until after the status conference which the Court will set by subsequent order.  The Court will not enter Final Judgment in this case until after the status conference, which will address the final damages calculations and other outstanding issues still requiring the Court's resolution.

---

[17] The Court already addressed and denied EQT's other arguments contained in this motion, particularly as they related to the motion for a new trial.  [*See* R. 220.]

34

This 25th day of June, 2015.

Signed By:

*Gregory F. Van Tatenhove*

**United States District Judge**